*829 OPINION OF THE COURT
Aileen Haas Schwartz, J.
The issue of mental illness in a criminal or juvenile delinquency proceeding tests our society’s dedication to the principle of fundamental fairness.[1] Two questions are raised in this case: (1) Does the preponderance standard of proof prescribed by subdivision 4 of section 760 of the Family Court Act comply with procedural due process requirements in the wake of Addington v Texas (441 US 418)? (2) Is respondent entitled to the procedural safeguards of article 9 of the Mental Hygiene Law, including the right to jury trial review, as an equal protection right pursuant to Baxstrom v Herold (383 US 107)?[2]
On September 25, 1978, respondent was found to have committed acts that would constitute the crime of unauthorized use of a vehicle (Penal Law, § 165.05), upon admission (Schwartz, J.). Prior thereto, on June 20, 1978, respondent had been found to have committed acts that would constitute the crime of criminal possession of a weapon in the fourth degree (Penal Law, § 265.01) upon admission (Miller, J.). Shortly after institution of the proceeding before Miller, J., respondent began to manifest severe emotional behavior on several occasions resulting in emergency temporary psychiatric hospitalization upon the orders of several Judges.
A dispositional hearing pursuant to sections 743, 745 and 760 of the Family Court Act was scheduled. That the respondent required "supervision”, "treatment” and "confinement” was virtually uncontested. (Family Ct Act, § 712, subd [g].) Rather was the hearing devoted in major portion to the issue of "mental illness * * * as defined in section 1.03 of the mental hygiene law, which is likely to result in serious harm to himself or others”. (Family Ct Act, § 760, subd 1.)
Three psychiatrists testified: Dr. Peter Guggenheim, Medical Director of Mental Health Services (Family Ct), Dr. Paul Perry, Attending Psychiatrist at Bellevue Hospital, and Dr. *830 Victor D’Arc, Chief Psychiatrist, Manhattan Children’s Psychiatric Center. Each psychiatrist diagnosed respondent as suffering from schizophrenia, paranoid type. Each testified to respondent’s state of acute psychosis, suicidal and aggressive. Dr. Guggenheim traced respondent’s development during the past year and recounted some 12 interviews. Respondent had been diagnosed as acutely psychotic on several occasions and repeatedly hospitalized on an emergency basis. The recommended treatment plan, confirmed by the attending doctors at Bellevue Hospital, included placement at a residential treatment center that could provide psychotherapy and psychotropic medication. "Only with medication,” the plan emphasized, "can this youngster’s psychiatric status be controlled.” Thorazine in varying dosages was prescribed. Respondent’s pattern of conduct was marked by frequent "escapes” and protracted absences from hospitals and other facilities. On December 5, 1978, respondent was apprehended after one such "escape”. Testimony by Dr. Guggenheim that respondent was acutely psychotic, that respondent had a "neck abrasion from hanging attempt”, that respondent had spoken of a "suicide attempt” earlier in the day, and that respondent threatened suicide resulted in emergency psychiatric hospitalization upon order of this court without opposition by the law guardian, counsel for respondent. Respondent absconded. Respondent was apprehended and returned to custody on January 31, 1979. Dr. Guggenheim last saw the respondent on that occasion. According to the doctor, who examined respondent on a top priority emergency basis, respondent had "deteriorated greatly.” Respondent was "grossly and markedly suicidal, threatening and aggressive”; respondent was "suffering auditory, hallucinatory experiences.” Respondent was remanded for emergency psychiatric hospitalization with the consent of the law guardian. Remand was extended with the law guardian’s consent.
At the dispositional hearing, the doctor rejected the earlier treatment plan and unqualifiedly recommended psychiatric hospitalization to protect respondent from his suicidal intentions. Dr. Guggenheim spoke of the "great danger of harming himself.”
Dr. Paul Perry who first met respondent at Bellevue Hospital during the last emergency remand, concurred in the diagnosis of Dr. Guggenheim and described respondent as depressed, suicidal, angry and threatening. Dr. Perry and Dr. *831 Geller, who had attended respondent on earlier emergency hospitalizations, decided that respondent now required long-term psychiatric hospitalization, and the two psychiatrists so certified for initiation of involuntary commitment proceedings.
Dr. Victor D’Arc examined respondent on March 8, 1979, after respondent’s admission to Manhattan Children’s Psychiatric Center, pursuant to section 9.27 of the Mental Hygiene Law, and continued the psychiatrist-patient relationship through the hearing which was commenced on March 14, 1979 and completed on March 19, 1979. The doctor concurred in the diagnosis of Dr. Guggenheim. Dr. D’Arc had first examined respondent in October through November, 1978, and was then convinced that respondent required long-term psychiatric hospitalization. He testified that respondent remained in an acute state and was presently suicidal and "possibly homicidal.”
The entire probation record was admitted into evidence with the recommendation by the probation department that respondent be placed with Division for Youth, title 3.
For purposes of this opinion, suffice it to say that as indicated above the evidence established beyond a reasonable doubt (without real opposition) that respondent requires "supervision, treatment or confinement” within the context of subdivision (g) of section 712 of the Family Court Act and is adjudicated a juvenile delinquent.
Legal issues regarding involuntary commitment for psychiatric hospitalization dominated the dispositional proceeding. At the very inception of the hearing, the court sua sponte, advised of its concern regarding the procedural due process sufficiency of the section 760 preponderance standard of proof and the respondent’s "equal protection” rights pursuant to Baxstrom v Herold (383 US 107, supra). Indeed, the issue of the constitutional sufficiency of the preponderance standard was raised during the hearing by respondent’s application to the court to dispense with the testimony of Dr. D’Arc as the doctor was and would continue in a psychiatrist-patient relationship in the event of a commitment.
Although the doctor’s testimony was limited to some extent upon consent, the court denied the application upon the ruling that the preponderance standard was constitutionally infirm. The ruling was made at that stage because only Dr. D’Arc had personal knowledge of respondent’s present condition and that factor was critical to a state of certitude greater than the preponderance standard. Parenthetically, it is noted that no *832 decision was reached as to the exact standard required by due process. The case sub judice and other like matters, however, proved vexing on that very issue.
The Attorney-General supported the constitutionality of the preponderance standard and continues to support that standard notwithstanding Addington v Texas (441 US 418), supra, decided subsequent to this court’s ruling (supra) that the preponderance standard is violative of procedural due process.
Addington v Texas (supra, at pp 419, 420) answered a question that had long troubled the judiciary and the legal commentators: "[W]hat standard of proof is required by the Fourteenth Amendment to the Constitution in a civil proceeding brought under state law to commit an individual involuntarily for an indefinite period to a state mental hospital”? The Supreme Court (at p 427) "conclude[d] that the individual’s interest in the outcome of a civil commitment proceeding is of such weight and gravity that due process requires the state to justify confinement by proof more substantial than a mere preponderance of the evidence.” The court (at p 432) also "concluded that the reasonable doubt standard is inappropriate in civil commitment proceedings because, given the uncertainties of psychiatric diagnosis, it may impose a burden the state cannot meet and thereby erect an unreasonable barrier to needed medical treatment.”
"[W]e turn,” the court (at p 431) stated, "to a middle level of burden of proof that strikes a fair balance between the rights of the individual and the legitimate concerns of the state.” The court (at p 431) held that the " 'clear and convincing’ ” standard is required to meet due process guarantees.
The opinion of the court was delivered by the Chief Justice and was one in which all other members of the court joined, except Mr. Justice Powell who took no part in the consideration or decision of the case. Notwithstanding the seeming "animal, vegetable or mineral” format, the opinion reveals the processes of the judicial mind grappling with an issue of profound importance in an area of tangled complexity. Concepts, not words, signify the import of Addington v Texas (supra), for Matter of Gault (387 US 1) and Matter of Winship (397 US 358) serve as its jurisprudential underpinnings.
"The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to 'instruct the factfinder concerning the degree *833 of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.’ In re Winship, 397 U. S. 358, 370 (1970) (Harlan, J., concurring).” (Addington v Texas, 441 US, supra, at p 423.)
The role delegated to the factfinder in a legal proceeding has long been recognized as one of critical significance. "To experienced lawyers,” the Supreme Court noted in Speiser v Randall (357 US 513, 520-521), "it is commonplace that the outcome of a lawsuit — and hence the vindication of legal rights — depends more often on how the factfinder appraises the facts than on a disputed construction of a statute or interpretation of a line of precedents.” "Thus,” the court reasoned, "the procedures by which the facts * * * are determined assume an importance fully as great as the validity of the substantive rule of law to be applied. And the more important the rights at stake the more important must be the procedural safeguards surrounding those rights.” Procedural due process commands that the standard of proof reflect the individual’s interest at stake. (Matter of Winship, supra; Speiser v Randall, supra.)
Judicial sensitivity to the procedural due process dimension of standard of proof has heightened appreciation of the analytical dissertation of Mr. Justice Harlan in his concurring opinion in Matter of Winship (supra). Indeed, Addington v Texas (supra), adopts that analysis as approved methodology for deterjnination of the standard of proof mandated by due process. Succinctly stated, Mr. Justice Harlan reasoned: (1) There is always risk of error in litigation; (2) Standard of proof should reflect an assessment of the "comparative social disutility” of an erroneous factual determination to each party; (3) Standard of proof should allocate the risk of error between the parties based upon such "comparative social disutility.” "In this context,” Mr. Justice Harlan explained, "I view the requirement of proof beyond a reasonable doubt in a criminal case as bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.” (Matter of Winship, 397 US, supra, at p 372.)
Addington v Texas (444 US, supra, at p 425) identifies the individual’s interest at stake as the very right to liberty— liberty, that "interest of transcending value.” (Speiser v Randall, 357 US, at p 525.) Addington v Texas (444 US, supra, at p *834 426) also takes cognizance of the State’s "legitimate interest under its parens patriae powers in providing care to its citizens who are unable because of emotional disorders to care for themselves * * * [and the State’s] authority under its police power to protect the community from the dangerous tendencies of some who are mentally ill.”
The preponderance of the evidence standard was easily rejected by the Supreme Court. "The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state” (441 US, supra, at p 427).
Evaluation of the competing interests regarding the reasonable doubt standard proved a more arduous task. A pragmatic evidentiary factor emerges as decisive (Addington v Texas, 441 US, supra, at pp 429, 430): "Whether the individual is mentally ill and dangerous to either himself or others and is in need of confined therapy turns on the meaning of the facts which must be interpreted by expert psychiatrists and psychologists. Given the lack of certainty and the fallibility of psychiatric diagnosis, there is a serious question as to whether a state could ever prove beyond a reasonable doubt that an individual is both mentally ill and likely to be dangerous * * * Nor should the state be required to employ a standard of proof that may completely undercut its efforts to further the legitimate interests of both the state and the patient that are served by civil commitments.”
Addington v Texas (441 US, supra, at p 431) explicitly characterizes the "clear and convincing” standard in civil commitment proceedings as "the constitutional minimum” and concludes with the caveat: "To meet due process demands, the standard has to inform the factfinder that the proof must be greater than the preponderance of the evidence standard applicable to other categories of civil cases.”
Does that admonition not pertain to the State of New York vis-á-vis a juvenile at a hearing pursuant to section 760 of the Family Court Act?
That an order pursuant to subdivision 1 of section 760 of the Family Court Act authorizes an involuntary "commitment” for psychiatric hospitalization within the purview of the Mental Hygiene Law is not contested. Nevertheless, the *835 Attorney-General supports the "preponderance of competent evidence” standard prescribed by subdivision 4 of section 760 of the Family Court Act as constitutionally sufficient. The Attorney-General would limit Addington v Texas (supra) to "the situation in which the choice before the committing court is between commitment to a mental hospital and release into the community at large.” "Actually,” the Attorney-General argues, "the situation of an FCA 760 commitment is more analogous to the situation of the certified criminal addict dealt with by the Court of Appeals in People v. Fuller, 24 NY 2d 292 (1969). In Fuller, the State’s highest court found that the standard of preponderance of the evidence was constitutionally adequate for a finding of narcotic addiction in a proceeding to determine the disposition under the Narcotic Control Act of 1966 of purported addicts who had been convicted of a crime and who, like juveniles committed pursuant to F.C.A. 760, had been afforded the full panoply of procedural rights at trial.”
The position of the Attorney-General is, at best, incongruent with Addington v Texas (supra), Matter of Winship (supra), Matter of Gault (387 US 1, supra), Baxstrom v Herold (383 US 107, supra), and People v Lally (19 NY2d 27), and represents a perversion of People v Fuller (supra).
At issue in People v Fuller (supra) was the claim that the reasonable doubt standard of proof requisite of a criminal trial was constitutionally mandated for a finding of addiction for certification in a criminal proceeding in which the individual has been convicted. The Court of Appeals reasoned (People v Fuller, 24 NY2d, at p 304), "Since the purpose of the certification is a rehabilitative one, it is legitimate to analogize it to a civil proceeding commenced against a noncriminal addict where the finding also may be made by a preponderance of the evidence.” Thus, contrary to the assertion of the Attorney-General, the preponderance standard adopted in People v Fuller (supra) represented the court’s equation of procedures with those prescribed for determination of "addiction” in a civil proceeding. "The issue,” the Court of Appeals emphasized (24 NY2d, at pp 304-305), "is identical * * * Thus, the fact that there is or is not an underlying conviction is wholly immaterial to the issue [addiction] to be decided.” (See Mental Hygiene Law, § 200 et seq., then in effect.)
Although article 9 of the Mental Hygiene Law does not provide a standard of proof for involuntary civil commitment to a State mental hospital, New York decisional law did *836 permit such commitment upon a preponderance of the evidence. (See Fhagen v Miller, 65 Misc 2d 163, 172, mod on other grounds 36 AD2d 926, affd 29 NY2d 348, cert den 409 US 845; People v Fuller, supra; but cf. Matter of Scopes, 59 AD2d 203.) Manifestly, the Addington v Texas (supra) "clear and convincing” standard now governs involuntary civil commitments to the Commissioner of Health under article 9 of the Mental Hygiene Law as a "constitutional minimum” of procedural due process.
Baxstrom v Herold (383 US 107, supra) and its New York progeny compel the conclusion that the preponderance standard for involuntary commitment of the respondent to the Commissioner of Mental Health would deny equal protection of the laws to respondent and others similarly situated.
Baxstrom v Herold (supra) held that petitioner was denied equal protection of the laws by a New York statutory procedure under which a person could be civilly committed at the expiration of his penal sentence without the jury review available to all other persons civilly committed in New York and was further denied equal protection of the laws by his civil commitment to an institution maintained by the Department of Correction beyond the expiration of his prison term without a judicial determination that he is dangerously mentally ill such as that afforded to all so committed except those nearing the expiration of a penal sentence. (See as to the latter, however, Matter of Kesselbrenner v Anonymous, 33 NY2d 161.)
Granted Baxstrom v Herold (supra) lends itself to an interpretation restricted to the specific circumstances involved. New York law proudly boasts adherence to the purpose of Baxstrom v Herold (supra). The New York Court of Appeals declared its intention to "comply with the spirit if not the express language of the Baxstrom decision”. (People v Lally, 19 NY2d, at p 35.) In People v Lally (supra), the Court of Appeals held that one adjudicated not guilty by reason of insanity is entitled to procedural safeguards prescribed for an individual not otherwise before a court.
Although not involving the issue of involuntary civil commitment to a mental hospital, the Court of Appeals in People v Fuller (24 NY2d, at p 305) reiterated New York law’s dedication to the essence of Baxstrom and held that the jury trial procedure available in civil proceedings must obtain in criminal proceedings at the certification stage to determine *837 addiction of the convicted individual. As the Court of Appeals explained in People v Fuller (24 NY2d, at p 305), "The Supreme Court [in Baxstrom] did not rest its decision on the argument, which the People urge makes it distinguishable, that a prisoner whose term was expiring was in the same position as a noncriminal. Rather, in the words of the court, the 'distinction made [must] have some relevance to the purpose for which the classification is made * * * Classification of mentally ill persons as either insane or dangerously insane of course may be a reasonable distinction for purposes of determining the type of custodial or medical care to be given, but it has no relevance whatever in the context of the opportunity to show whether a person is mentally ill at all.’ ”
Legal disciples of the Baxstrom doctrine speak of the underlying common issue as the issue of committability to avoid confusion in an area of developing substantive due process standards that now proscribe involuntary commitment on the ground of "mental illness” alone. (See O’Connor v Donaldson, 422 US 563.)
The saga of Roy Schuster presented the Court of Appeals, Second Circuit, with the question of whether the Baxstrom principle applies to a prisoner who is transferred to a State institution for insane criminals. The State took the same position in the Schuster case as is now advanced by the Attorney-General before this court. United States ex rel. Schuster v Herold (410 F2d 1071, 1078, cert den 386 US 847) graphically portrays the grim realities of psychiatric hospitalization even within the context of a transfer from "prison” to "asylum”. "In considering the problem posed we are faced with the obvious but terrifying possibility that the transferred prisoner may not be mentally ill at all. Yet he will be confined with men who are not only mad but dangerously so. As the New York Courts have themselves indicated, he will be exposed to physical, emotional and general mental agony. Confined with those who are insane, told repeatedly that he too is insane and indeed treated as insane, it does not take much for a man to question his own sanity and in the end to succumb to some mental aberration.” The Court of Appeals, Second Circuit, rejected the very argument now urged by the Attorney-General in this proceeding and concluded that Baxstrom was apposite. (See, also, United States ex rel. Schuster v Vincent, 524 F2d 153.) "Baxstrom clearly instructs that the procedures to be followed in determining whether one is *838 committable must be unaffected by the irrelevant circumstance that one is or has recently been under sentence pursuant to a criminal conviction, although the fact that one has committed a crime may be relevant to the substantive conclusion that he is mentally ill.” (410 F2d, at p 1081.) "[WJhile prior criminal conduct is relevant to the determination whether a person is mentally ill and dangerous, it cannot justify denial of procedural safeguards for that determination.” (Cameron v Mullen, 387 F2d 193, 201.)
Decisional precedents in the name of the Baxstrom principle clearly compel inclusion of the Addington v Texas (441 US 418, supra) "clear and convincing” standard as a procedural safeguard in determining committability for psychiatric hospitalization, notwithstanding the individual’s involvement in a criminal or like proceeding, including conviction and imprisonment.
Baxstrom, Lally and Schuster as "equal protection” cases require substantial equality of procedural safeguards afforded the individual vis-á-vis the State on the issue of committability. Baxstrom, Lally and Schuster do not restrict their "equal protection” aegis to procedures that are mandated by due process. A fortiori, a procedural safeguard that is a due process requirement.
The jurisprudential force of Baxstrom, Lally and Schuster lies in the recognition that commitment for psychiatric hospitalization is a "massive curtailment of liberty” (Humphrey v Cady, 405 US 504, 509) even within the context of a transfer from "prison” to "asylum”. What State interest would be served by a standard that would allocate risk of error equally between the State and the individual who is a convict? If the liberty interest of the prisoner is not as great as that of one not imprisoned, so, too, is the danger to the State from error in fact finding less dangerous. The teaching of Baxstrom, Lally, Schuster and Addington is that the State must sustain a burden greater than the preponderance standard if it would diminish the individual’s liberty by commitment for psychiatric hospitalization. The Addington "clear and convincing” standard is a symbol of our society’s profound dedication to individual liberty and inviolate individuality and, as such, serves as the procedural due process right of any individual confronted by the awesome authority of the State in an involuntary commitment proceeding.
Generally speaking, New York statutory law is not violative *839 of the Addington standard or the Baxstrom principle. Indeed, in the wake of evolving concepts of substantive and procedural due process defining the rights of the mentally ill vis-á-vis the State, the New York Legislature has reformulated the Mental Hygiene Law and related laws into a comprehensive and integrated statutory scheme. (See Mental Hygiene Law, art 9; Correction Law, art 16; see for purposes of this issue only those provisions regarding procedural safeguards, CPL 330.20 as interpreted by People v Lally, 19 NY2d 27, supra; see, also, CPL 730.70.) No standard of proof is prescribed in the matrix statute, article 9 of the Mental Hygiene Law, nor is one provided in the aforesaid related laws.
Subdivision 4 of section 760 of the Family Court Act is an exception. (See, also, Executive Law, § 517, which is troublesome in substantive and procedural aspects.) Recently enacted, section 760 of the Family Court Act constitutes the legislative response to the adjudicated juvenile delinquent who is mentally ill and who, as a result of such illness, is a danger to himself or to others. Subdivision 1 of section 760 of the Family Court Act incorporates Mental Hygiene Law to define "mental illness” and meticulously defines "[l]ikelihood to result in serious harm” to mean "(1) substantial risk of physical harm to himself as manifested by threats or attempts at suicide or serious bodily harm or other conduct demonstrating he is dangerous to himself or (2) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious bodily harm.” The language is identical to the standard prescribed in article 9 of the Mental Hygiene Law. (See Mental Hygiene Law, § 9.39.) The legislative intent to comport with substantive due process standards is evident. (See, e.g., O’Connor v Donaldson, 422 US 563, supra; Jackson v Indiana, 406 US 715; Covington v Harris, 419 F2d 617; Matter of Kesselbrenner v Anonymous, 33 NY2d 161, supra; Matter of Andrea B., 94 Misc 2d 919.)
When enacted, subdivision 4 of section 760 of the Family Court Act embodied the procedural due process standard of proof then required by New York decisional law in involuntary civil commitment proceedings. Additionally, the Legislature added section 9.49 to the Mental Hygiene Law to ensure the safeguarding of the juvenile’s substantive and procedural due process rights and equal protection rights. Section 9.49 of the Mental Hygiene Law provides in part: "Transfer of juve *840 nile delinquents * * * Any juvenile placed pursuant to this section shall be subject to the provisions of article nine of this chapter.” As conceded by the Attorney-General, section 9.49 affords the juvenile delinquent all of the procedural safeguards prescribed by article 9, including review of court authorization to retain an involuntary patient by a jury trial pursuant to section 9.35. As article 9 of the Mental Hygiene Law prescribes the statutory standards governing involuntary civil commitments, the intent of the Legislature to afford all such statutory safeguards to a juvenile at a section 760 of the Family Court Act hearing appears clear. That section 760 of the Family Court Act prescribes a lesser standard of proof than now required in involuntary civil commitment procedures under article 9 of the Mental Hygiene Law is attributable to the fact that Addington v Texas (441 US 418, supra) effected a change in the constitutionally mandated standard of proof.
Whatever the earlier due process mandates, now to sanction the preponderance standard of proof prescribed by section 760 of the Family Court Act would be to defy Addington v Texas (supra), Matter of Winship (397 US 358, supra), Matter of Gault (387 US 1, supra), and Baxstrom v Herold (383 US 107, supra).
No longer is there validity to the assertion that "a child, unlike an adult, has a right 'not to liberty but to custody’ ” (Matter of Gault, 387 US, at p 17) as a postulate for involuntary psychiatric institutionalization, even of a juvenile delinquent. "[Wjhatever may be their precise impact, neither the Fourteenth Amendment nor the Bill of Rights is for adults alone.” (Matter of Gault, 387 US, at p 13.)
Article 9 of the Mental Hygiene Law does not provide for dilution of the procedural safeguards of a minor in an involuntary civil commitment proceeding. Parenthetically, it is noted that this case does not involve the more complex subject of so-called "voluntary” commitment of a minor. (See, e.g., Institutionalized Juveniles v Secretary of Public Welfare, 459 F Supp 30, now pending before the Supreme Court; J. L. v Parham, 412 F Supp 112, now pending before the Supreme Court; Bartley v Kremens, 402 F Supp 1039, vacated and remitted 431 US 119.)
It is true that although the Supreme Court has been "reluctant to attempt to define 'the totality of the relationship of the juvenile and the state’ ” (Carey v Population Servs. Int., 431 *841 US 678, 692), the Supreme Court has "held in a variety of contexts that 'the power of the state to control the conduct of children reaches beyond the scope of its authority over adults’.” (431 US, at p 692.) Further, Carey v Population Servs. Int. (431 US, at p 693, n 15) suggests that State restrictions of fundamental rights vis-á-vis a minor may be subject to a less rigorous test, to wit, significant State interest, as contrasted with the compelling State interest test applied to restrictions of the rights of adults.
Even within the framework of "less rigorous” judicial scrutiny, however, no such interest has been presented by the State either in the due process or equal protection context to justify psychiatric hospitalization of a juvenile delinquent upon what Addington v Texas (441 US, supra, at p 427) aptly characterizes as "a mere preponderance of the evidence.”
Matter of Winship (supra) proves a compelling analogy in support of the "clear and convincing” standard as a Baxstrom equal protection right and, indeed, an Addington procedural due process right for the juvenile in a proceeding pursuant to section 760 of the Family Court Act. The clear and convincing standard is deemed constitutionally mandated. Now it is for the Legislature to tidy the statute so that a reading of section 760 of the Family Court Act will comport with the law’s "evolving standards of decency that mark the progress of a maturing society.” (Trop v Dulles, 356 US 86, 101, per Mr. Chief Justice Earl Warren.)
As to the matter sub judice, the preponderance standard is rejected as constitutionally infirm. Indeed, the competent evidence of respondent’s present condition is so qualitatively strong as to sustain a finding beyond a reasonable doubt that respondent is mentally ill (schizophrenia, paranoid type) and presently, as a result of such illness, is in danger of serious self-harm unless committed for psychiatric hospitalization. Respondent is placed pursuant to subdivision 1 of section 760 of the Family Court Act with the Division for Youth for transfer, effective herewith, to the custody of the Commissioner of Mental Health, and it is further ordered that respondent is entitled to the same rights and procedures under the Mental Hygiene Law as an individual involuntarily civilly committed thereunder, including the rights provided by section 9.35 of the Mental Hygiene Law and application thereunder of the clear and convincing standard of proof.

. Findings were made and decision rendered orally at the conclusion of the hearing. In view of the importance of the issues raised and the effect upon untold numbers of individuals, it was deemed advisable to treat the matter in a written opinion. Those involved were afforded an opportunity to submit briefs. The Attorney-General submitted a brief dated May 4, 1979.

. The subject of this opinion does not involve mental disease or defect as a defense pursuant to section 30.05 of the Penal Law or mental disease or defect excluding fitness to proceed pursuant to CPL article 730.