OPINION OF THE COURT
Martin Evans, J.
This conservator’s motion seeking permission to renounce an inheritance requires the court to analyze the effect of such a renunciation on her charge’s eligibility for govern men tally afforded medical benefits. In so doing, it raises important questions about the proper roles of the court and the conservator.
Movant Joan Rossi is a granddaughter of Julia Molinelli, an 84-year-old patient confined at the Isabella Geriatric Center, a nursing home in upper Manhattan. After a hearing, and upon a showing that Mrs. Molinelli was unable to maintain her affairs, movant Rossi was appointed conservator of her property by this court on July 20, 1982.
This motion is opposed by both the nursing home and the City of New York; leave for them to intervene is deemed requested, and granted, without opposition.
*205 Mrs. Molinelli’s sister, Marie Scrivani, died intestate on December 6, 1981, apparently leaving Mrs. Molinelli as her sole distributee. The Scrivani estate amounts to approximately $50,000. It was obvious that this estate, if not renounced, would be immediately subject to the claims of Mrs. Molinelli’s creditors, principally the nursing home and others responsible for her care, upon transfer to her. Evidence in the conservatorship proceeding indicated that Mrs. Molinelli, when able to manage her affairs, expressed the desire that the inheritance go to her children who needed it more than she. Upon Mrs. Scrivani’s death, however, Mrs. Molinelli was no longer competent to execute a knowing and intelligent renunciation; having been institutionalized for a prolonged period, Mrs. Molinelli was unable to rationally assess the alternatives and express her wishes. Counsel for movant, when applying for the conservatorship, commendably disclosed that such a renunciation was in contemplation and would be sought from this court. Because other issues were clearly presented, and because other parties, not before the court on the conservatorship application might be adversely affected without an opportunity to be heard, this court directed that a separate proceeding be brought.
I
Movant, by this proceeding, seeks leave to this court to file a renunciation of the inheritance, in the stead of her grandmother and ward, in the Surrogate’s Court, Kings County, where the Scrivani estate is under administration. She contends that it is sought for a proper purpose, i.e., to fulfill her grandmother’s desire to provide for her children. She is opposed by two parties: the nursing home and the New York City Department of Social Services. The nursing home indicates that, while it is not now a creditor of Mrs. Molinelli, being regularly reimbursed through the Medicaid program for her care, it may in the future become a creditor if Mrs. Molinelli’s Medicaid eligibility is cut off by the rejection of available resources. The city similarly indicates that while it does not seek to assert claims for past Medicaid benefits paid, and, while not waiving any such future claim, it would be constrained to terminate Mrs. Molinelli’s Medicaid benefits.
*206 Movant, in reply, represents that Mrs. Molinelli’s needs will be guaranteed by unspecified members of her family, and asserts that termination of Medicaid eligibility is properly the subject of a different proceeding. Movant has not herself promised to guarantee her grandmother’s needs and expenses; neither does she appear to be authorized to bind any other family member. Movant’s second assertion is technically correct: termination of Medicaid assistance is properly the subject of an administrative proceeding, which can be challenged by a CPLR article 78 proceeding; a determination as to continued eligibility also can be sought by declaratory judgment. Nevertheless, since the question significantly bears on the future well-being of the conservatee, this court is bound to consider it, even if the relief sought in all other respects is appropriate.
This court’s authority over the question is both inherent and statutory. This court has the inherent power to supervise the conduct of its officers and appointees, and to safeguard the welfare of its wards. (See Matter of Berman, 24 AD2d 432.) This important policy consideration is codified in the statute governing procedure for such renunciation on behalf of wards of the court. EPTL 2-1.11 (subd [c]) states: “A renunciation on behalf of an infant, incompetent, conservatee or a decedent shall be made by the guardian of the property of such infant, a committee of such incompetent, a conservator of such conservatee or the personal representative of such decedent. Such renunciation shall not be effective unless, prior thereto, the guardian, committee, conservator or personal representative has been authorized to renounce by the court having jurisdiction of the estate of the infant, incompetent, conservatee or decedent.” The statute properly recognized that it is the court having jurisdiction over the renouncing beneficiary, not that with jurisdiction over the donor’s estate, which is empowered to authorize the renunciation.
The procedure for authorizing renunciations cannot be regarded as pro forma or ministerial; it is a significant responsibility. Conservators and other fiduciaries are appointed by the court to discharge the community’s responsibility to protect those who are incompetent to adequately conduct their personal and business affairs. (Mental Hy *207 giene Law, arts 77, 78; see Sporza v German Sav. Bank in City of N. Y., 192 NY 8.) The appointment of such a personal representative automatically effects a significant loss of the ward’s individual freedom, which varies according to the extent of the ward’s incompetency and the degree of his understanding. This loss of freedom — often painful to both the ward and the court which must order it — is deemed necessary to protect a ward who is incapable of freely exercising his own life-choices. It can only be justified if the State, acting through the court, assures the ward’s best interests being protected, and if the conservator exercises his substituted judgment accordingly. The court therefore may, and indeed should, consider any matter which may affect the ward’s welfare, including the possible future legal consequences of a fiduciary’s proposed course of action. (See Carter v Beckwith, 128 NY 312, 319.) Even though it may be argued that the nursing home and the city lack standing to qbject to an otherwise legal renunciation, since each has at most a speculative stake in the outcome (see, generally, Simon v Eastern Ky. Welfare Rights Organization, 426 US 26), each has a relationship with the conservatee (i.e., either as a direct or indirect primary care provider) which gives rise to a responsibility to her. It is thus not only appropriate, but incumbent on them, to bring to the court’s attention any circumstance which might jeopardize the conservatee’s well-being.[1]
II
It is settled law in New York that a distributee may freely renounce a testate or intestate disposition for any *208 reason or no reason, even if the renunciation has the effect, or indeed, the object, of frustrating creditors or avoiding taxes. (EPTL 2-1.11 [which extended the common-law rule to intestate distribution]; Matter of Schiffman, 105 Misc 2d 1025; Matter of Deitch, 106 Misc 2d 690.)
At first glance, this rule appears to conflict with other long-standing and well-established values, by seeming to encourage the evasion of one’s just debts. Closer analysis indicates otherwise. Any postmortem distribution, whether by will or by operation of law, is a donative transfer like any other. The law forces no one to accept a gift. To hold otherwise may impose an unintended hardship on the recipient intended to be benefited, as by triggering unanticipated and unnecessary additional tax liability. Moreover, it may frustrate the intent of the deceased, who sought to benefit the distributee and not a private or public creditor. (See Rohan, Practice Commentary, McKinney’s Cons Laws of NY, Book 17B, EPTL 2-1.11, pp 260-264; Third Report of Temporary State Comm on Modernization, Revision and Simplifiction of Law of Estates, NY Legis Doc, 1964, No. 19, pp 257-258.)
A renunciation speaks retroactively as of the decedent’s death, thus effecting a situation equivalent to that where the beneficiary predeceases the decedent: no gift ever vested in the beneficiary. Thus, not even an express purpose of defeating a claim for Medicaid reimbursement would thereby render a renunciation illegal; it is not itself, absent other compelling considerations, sufficient cause for a court to set a renunciation aside. (Matter of Schiffman, supra.)
It is axiomatic that any act, itself legal, may have unintended and often harmful jural consequences. The renunciation sought here, while not itself illegal, is incompatible with other principles of law, and appears likely to cause adverse consequences for the conservatee. The Medicaid program is intended to provide comprehensive, government-financed medical care for those citizens who would otherwise be unable to afford adequate care. Like other government entitlement programs based on need, eligibility for benefits is predicated on an excess of covered expenses over available financial resources. (See Social *209 Services Law, § 366, subd 1, par [a], cl [5], subcl [1].) Not only is the purpose of the law to aid only economically disadvantaged persons; the economic viability of the Medicaid program itself can be maintained only if eligibility requirements are diligently observed. (Executive Dept Legis Memorandum in support of L 1982, ch 56, McKinney’s Session Laws of NY, 1982, pp 2429-2431; Governor’s message on approval, id., p 2590.)
In order to both limit over-all costs and assure that limited public resources remain available to assist the intended beneficiaries of the program, the Legislature specifically sought to curtail assistance to those less needy persons who transferred assets which would otherwise have been available to pay medical costs. (Medicaid Cost Containment Amendments Act, L 1982, ch 56, signed into law April 12, 1982.) The legislation, in a new provision codified as subdivision 5 of section 366 of the Social Services Law, automatically includes as an “available resource” the “uncompensated value of any nonexempt resource transferred within twenty-four months prior to the application for medical assistance.” Indeed, this provision when read in pari materia with the other eligibility requirements of the statute, would effectively bar Mrs. Molinelli from Medicaid benefits until she incurred medical expenses exceeding the $50,000 value of the inheritance, whether or not she were to renounce.
While a renunciation, as the formal rejection of a gift, compels the conclusion that the inheritance never became the property of the beneficiary, it cannot alter the inheritance’s status. It is an inchoate property interest, which clearly has value and is available to the beneficiary; common sense dictates that it cannot be other than an “available resource” for Medicaid purposes. Thus, while a renunciation is technically not a transfer of specific property in which the beneficiary holds title, it is the transfer of a resource.[2]
*210 III
While a competent beneficiary may knowingly and intelligently renounce an inheritance and voluntarily suffer the consequent loss of Medicaid eligibility, one not competent, by definition, cannot. Indeed, that is one reason for the court approval mandated by statute and sought here. A second reason is no less important. While conservators and other fiduciaries ordinarily have the discretion to act for their wards, certain situations are so fraught with possible conflict of interest and untoward consequences that the fiduciary cannot be permitted to act alone without court approval. The fiduciary’s responsibility is “to function as agent of the court in the exercise of the latter’s jurisdiction over the incompetent and his property.” (Matter of Aho, 39 NY2d 241, 246.) This responsibility cannot be exercised if the fiduciary has a conflict of interest with that of his ward. When a fiduciary does not have an interest adverse to that of his ward, a fiduciary is not disqualified solely because he himself may benefit along with his ward from the decision sought to be taken. Thus, an executor and beneficiary of both his parents’ estates was permitted to renounce, on behalf of his mother’s estate, the proceeds of his father’s life insurance. (Matter of Deitch, 106 Misc 2d 690, supra.) Since personal fiduciaries are frequently close relatives or friends who share prior close relationships of trust with their wards, it is not surprising that they are often the *211 wards’ distributees, and thus may have pecuniary interest in the results wrought by their own decisions. In the abstract, self-interest is not synonymous with conflict of interest; in practice, the classification may well be difficult. Wherever there is interest, there may be conflict. Not only must the court closely scrutinize each situation; the fiduciary should scrupulously disclose any potential conflict.
Here, the circumstances reveal only potential self-interest, but given the very consequence of renunciation — entitlement disqualification — the court finds an impermissible conflict. There is no evidence that the conservator has acted with improper motivation, or is unconcerned with her grandmother’s well-being. Nevertheless, she is also the daughter of one of her ward’s children and distributees, and may well be an indirect distributee herself. The conservator proposes that unnamed family members assume the responsibility for Mrs. Molinelli’s care; she does not, nor cannot, give any definite guarantee that the family will assure Mrs. Molinelli’s future needs, while themselves now assuming the tangible benefits of the renunciation. In Schiffman (105 Misc 2d 1025, supra) and Deitch (supra) the fiduciary benefited by his own decision, to the detriment of creditors, with no adverse impact on the party the fiduciary was bound to protect. Here, the fiduciary may cause a closer relative to benefit to the detriment of the one she must protect. This she cannot do. While denial of the renunciation sought will not alter Mrs. Molinelli’s Medicaid eligibility, it will at least assure her personal needs until, upon exhaustion of the inheritance, she is again eligible for Medicaid.[3]

. It is always important for the consequences of such a renunciation to be evaluated by one, other than the proponent, who is fully independent and impartial. Notice to the guardian ad litem, the logical and appropriate party to scrutinize the request, is not specifically mandated by EPTL 2-1.fi (subd c); the guardian ad litem nevertheless appears to be a necessary party who should be given notice. (See CPLR 1001; cf. SCPA 2106 applicable in Surrogate’s Court proceedings where analogous interests are affected.) Although the function of the guardian ad litem is ordinarily completed upon the adjudication of incompetency, he remains guardian until formally discharged. Although the guardian has not been formally discharged, he apparently has not been given notice of this application. Since the court is clearly empowered to appoint a guardian ad litem on this application, as part of its inherent power to protect its ward (Matter of Berman, 24 AD2d 432) and by general statutory authority (CPLR 1202), a fortiori it can concomitantly direct that an extant guardian be given notice, if that be deemed necessary. Rather than dismiss on a procedural ground, or prolong the proceedings and further burden the parties and the conservatee’s estate, given the unusual and clear circumstances of this case, the court finds it preferable to render a decision on the merits.

. Because the new legislation embraces resource transfers made within the two years prior to “the date of application for medical assistance” it could be argued that the statute is inapplicable to situations such as that at bar where the transfer is made after a *210 successful prior application for Medicaid assistance. Such a view would vitiate the plain intent of the law. A better view would be to interpret “date of application for medical assistance” as meaning not the initial application for eligibility classification, but each date thereafter when medical assistance is sought under the program.
While the new statute automatically disqualifies Mrs. Molinelli from Medicaid eligibility whether she accepts or renounces the inheritance, she would have been disqualified in the absence of statute under the prior standards of need. (See Social Services Law, §§ 363,365-a, 366, subd 2, par [b]; Matter of Flynn v Bates, 67 AD2d 975; Matter of Barie v Lavine, 48 AD2d 36.) In Flynn, the court held that a spouse’s right of election amounted to an available resource, and that the deliberate failure to elect against the will disqualified the spouse from eligibility. “[T]he petitioner may not knowingly and intelligently waive her legal right to a sizable sum of money and then present herself as a ‘needy person’.” (Flynn v Bates, 67 AD2d 975, 976.) Passage of the new legislation, however, was necessary to penalize resource transfer in the wake of Caldwell v Blum (621 F2d 491, cert den 452 US 909). The court there held that New York’s eligibility standards, which penalized resource transfers by disqualification, even in cases of genuine, existing need, were inconsistent with the standards of the Federal Medicaid enabling legislation contained in the Social Security Act, which permitted “disposal” of property. (Cf. US Code, tit 42, § 1382b, subd [b].) In response, Congress amended the act to permit States to deny Medicaid benefits to any person who “would not be eligible * * * but for the fact that he disposed of resources for less than fair market value.” (PL 96-611, § 5, subd [b], Dec. 28,1980, codified at US Code, tit 42, § 1396a, subd [j], par [1].)

. It is all too obvious, to even the casual observer, that the current system discourages the still valid virtues of thrift and saving among both individuals and institutions. This problem requires legislative rather than judicial solution.