OPINION OF THE COURT
Kristin Booth Glen, J.
This petition, brought pursuant to article 77 of the Mental *330 Hygiene Law, raises a serious and recurring problem concerning the potential misuse of New York’s conservatorship proceeding and its effect on the statutory and constitutional rights of New York’s elderly population.
PROCEDURAL HISTORY
This special proceeding was commenced to request the appointment of a conservator for Virginia Fisher. I appointed a guardian ad litem (G.A.L.) to protect the spoken, wishes of Ms. Fisher and conducted a hearing on June 2, 1989 and on June 6, 1989.
The testimony of June 2, 1989 by the G.A.L., a doctor and social worker retained by the G.A.L. adduced the following:
Ms. Fisher is an 83-year-old retired junior high school principal who resides alone in a large studio apartment on East 48th Street. She is financially secure, having recently inherited $68,000 from a friend and having an additional $110,000 in securities and bank accounts, as well as a pension and Social Security.
Ms. Fisher’s physical and psychological condition appears to have begun to deteriorate over the past two years. On February 7, 1989, she was admitted to Lenox Hill Hospital. One month later she was "worked up” and found to be suffering from uterine cancer. She subsequently had surgery and radiation treatment, and was thereafter transferred by the hospital to Florence Nightingale Nursing Home.[1]
When the G.A.L. visited Ms. Fisher at the home, she was lucid, cooperative and anxious to return to her apartment. The G.A.L. accordingly retained a doctor who examined her and encouraged her discharge, believing that she would be able to reside in the community with adequate supervision. The doctor did, however, recommend that she should have home care assistance at least four hours per day, five days per week.
Once she was returned to her apartment, both the doctor and the G.A.L. noticed Ms. Fisher’s deterioration. She refused to accept the services of a health care worker and was not taking proper care of herself or her home; the apartment was dirty and she looked dissheveled. She was confused about what time it was and appeared to spend much of her time in a *331 nightgown in bed. She was not regularly taking her medication. Although Ms. Fisher discussed the details of her financial affairs with the G.A.L. the social worker retained by the G.A.L. to do case management found her checkbook unbalanced and did not believe that Ms. Fisher had a real understanding of her actions in writing checks for home care attendants.
Because Ms. Fisher declined to come to court, I continued the hearing at her apartment on June 6, 1989. I found the apartment to be neat, but dusty. Ms. Fisher herself was dressed, but clearly had not attended to her hair for some time. Throughout the interview Ms. Fisher appeared to be completely lucid, coherent and fully aware of what transpired. When questioned about her finances, she was able to accurately discuss the details of her resources, including the recent bequest from her friend. She was able to identify her various charge accounts and knew the amount of her monthly rent; she also stated that she paid all of her bills on a timely basis.[2] When questioned about health care workers and the possibility of being sent to a nursing home if she did not consent to accept the care of health attendants, she reluctantly agreed, stating that she would rather leave the State or be dead than to return to the nursing home.
Based upon their observations of Ms. Fisher over the course of the proceedings, both the G.A.L. and petitioner’s attorney requested me to issue an order requiring Ms. Fisher to accept the services of a home attendant or a social worker/case manager. Petitioner’s attorney particularly stressed that because Ms. Fisher "needed help,” an order appointing a conservator with substantial powers to make health care and placement decisions for Ms. Fisher was necessary and, indeed, required by the statute.[3]
This opinion is written and published not only because I find, as set forth below, that Virginia Fisher is not in need of a conservator, but also to dispel the widely held notion that conservatorship provides a vehicle for the management of a conservatee’s person, by ostensibly authorizing the conservator to make health care and placement decisions that infringe upon the conservatee’s personal liberty under the guise of protecting and promoting the conservatee’s "best interest.”
*332 STATUTORY SCHEME
Persons who are unable to manage themselves or their own affairs have long been subject to the parens patriae power of the State. (See, e.g., 1 Perlin, Mental Disability Law 139-140 [1989].) Prior to 1972, the sole statutory authority for dealing with such issues was found in article 78 of the Mental Hygiene Law, the so-called "Committee” statute.[4]
The appointment of a committee is dependent upon a finding of incompetence, and serious consequences, including the loss of the right to vote, flow from the declaration of incompetence made in such a proceeding. (See, e.g., Manhattan State Citizens’ Group v Bass, 524 F Supp 1270 [SD NY 1981].) Recognizing that some individuals might not be sufficiently incapacitated to justify a declaration of incompetence, but might also not be able to manage their financial affairs, various commentators and Law Revision Commissions recommended the enactment of a statute to deal with this substantially more limited infringement of an individual’s rights.[5]
After several unsuccessful attempts to pass such legislation, article 77 of the Mental Hygiene Law, the conservatorship statute, was passed in 1972. (See, L 1972, ch 251.) The legislative intent, as stated in the memorandum accompanying the law, emphasized its response to the need to "preserve the property” of those unable to manage their own affairs. (Mem of Joint Legis Comm on Mental and Physical Handicap, 1972 McKinney’s Session Laws of NY, at 3290.) The purpose of the statute was solely to deal with the finances of the conservatee, and not to deprive her of any of the civil rights or other individual choices which might be lost as a result of the *333 declaration of the incompetency and appointment of a committee under article 78.®
The statute provides that a conservator or conservators of the property of a New York resident who has not been judged as incompetent may be appointed for a person who has "suffered substantial impairment of his ability to care for his property or has become unable to provide for himself or others dependent upon him for support” as a result of "advanced age, illness, infirmity, mental weakness, alcohol abuse, addiction to drugs or other cause”. (Mental Health Law § 77.01 [1] [a].) The statute specifically requires that this finding be made on "clear and convincing” evidence. (Mental Hygiene Law § 77.01 [1]; see, e.g., Matter of Bailey, 46 AD2d 945 [3d Dept 1974]; Matter of Kraft v Ziskind, 60 AD2d 548 [1st Dept 1977].) In addition to the showing of "impairment,” the petitioner must demonstrate the need for the appointment of a conservator. (See, e.g., Matter of Forst, 53 AD2d 842 [1st Dept 1976]; Matter of Forward, 86 AD2d 850 [2d Dept 1982] [proposed conservatee had executed irrevocable trust to provide for her medical and living expenses so that even in the event of the impairment of her ability to care for her property, trust would continue in force and care for her property and her for the duration of her life].)
The conservatorship proceeding takes place in the Supreme Court in New York City and in the County Court in other counties throughout the State. (Mental Hygiene Law § 77.01 [1].) Notice of the petition is given to the proposed conservatee and to relatives or others who may be financially affected by the appointment of a conservator. (Mental Hygiene Law § 77.07 [a].) The proposed conservatee is required to be present at the hearing unless she is unable to attend by reason of physical or other inability and such inability is established to the satisfaction of the court. (Mental Hygiene Law § 77.07 [b].)[6]
[7]
A G.A.L. "may be appointed at any stage of the proceeding” *334 to "represent the interest of’ the proposed conservatee.* *****[8] (Mental Hygiene Law § 77.09.) If the proposed conservatee, or any other party to the proceeding makes a timely demand, a trial by jury must be afforded. (Mental Hygiene Law § 77.07 [c].) If no jury trial is demanded, a hearing is held. If the court is persuaded (by clear and convincing evidence) that the proposed conservatee has suffered a substantial impairment of ability and is in need of a conservator, one is appointed.
Since the assumption is that the conservator will only be managing the property of the conservatee, the subsequen. procedural safeguards relate only to that property. For example, a bond is required, and periodic financial accountings must be filed in the county in which the appointment was made. (Mental Hygiene Law §§ 77.13, 77.29, 77.31.) There is no provision for periodic review of the conservatee’s need for a continuing conservatorship, other than those placed specifically in orders appointing conservators by Judges, nor is there a requirement of periodic reporting concerning the conservatee’s condition.
The requirements concerning the process of appointing a conservator, qualifying to serve, posting a bond, marshalling the conservatee’s assets, preparing an annual inventory, terminating the conservatorship and preparing a final accounting are set forth in Federman, Conservatorship: A Viable Alternative to Incompetency (14 Fordham Urban LJ 815, 853 [1986]; see also, Strauss and Wolf, New York Law of Conservatorship, NYLJ, Jan. 31, 1986, at 1, col 1).
Significantly for this case, Mental Hygiene Law § 77.19 sets *335 forth a conservator’s powers and duties, and provides that the "court order appointing a conservator shall set forth * * * the court approved plan for the preservation, maintenance, and care of the conservatee’s income, assets, and personal well-being”. The words "and personal well-being” were added to the statute in 1974, but were left undefined.[9]
The ambiguity of this statutory reference was increased by additional legislative action in 1981. (See, e.g., Moore, The Durable Power of Attorney as an Alternative to the Improper Use of Conservatorship for Health-Care Decision Making, 60 St. Johns L Rev 631, 649-652 [1986].) When the New York Law Revision Commission recommended the amendment of well over 100 statutory provisions which previously contained references to committees for incompetents they did so to "include reference to the additional and newer concept of conservators and consérvateos.” (1981 Report of NY Law Rev Commn, at 309.)
This wholesale change of statutes in which the word "committee” or "incompetent” formally appeared resulted in what at least one commentator has referred to as the "inappropriate amendment” of section 2803-c (3) of the Public Health Law. (Moore, op. cit., at 650.) That statute sets forth the rights and responsibilities of patients in medical facilities in New York State.[10] Prior to the 1981 amendment, the section provided that in the event of an adjudication of incompetency, the patient’s committee was to exercise these rights and *336 responsibilities in a representative capacity. The amendment of paragraph (j) allowed a conservator to exercise the rights of the patient as well.[11] This amendment, although not contained in article 77, has led some commentators and public officials to believe that conservators are entitled to make substitute health care decisions for consérvateos, notwithstanding any determination of incompetency.
For the reasons discussed below, the grant of such power to a conservator would be of highly questionable constitutionality, and, indeed, the Law Revision Commission has recommended its repeal.[12] It appears that the First Department has also rejected this possible reading of the statute. (Matter of Detzel, 134 AD2d 205 [1st Dept 1987] [Conservator’s power to carry out court-approved plans for preservation, maintenance, and care of conservator’s income, assets and personal well-being did not authorize involuntary commitment of conservatee to medical facility. Involuntary commitment could only follow a plenary hearing in which conservatee’s rights were safeguarded by appointment of a guardian ad litem.])
CONSTITUTIONAL CONSIDERATIONS
The Constitution, and particularly the Fourteenth Amendment, guarantee individual rights to liberty and property against unwarranted State encroachment.[13] To the extent that the State chooses or attempts to invade an individual’s liberty, or to deprive her of her property, the State must demonstrate *337 a substantive basis and an appropriate set of procedural protections. The latter must be commensurate with the gravity of the right at stake, the possibility of error in determination and the competing cost to the State of adopting other means. (E.g., Mathews v Eldridge, 424 US 319 [1976].)
The decision to appoint a conservator has legal and practical impact on both property and liberty interests. While the appointment of a conservator does not include a finding of incompetence with its concomitant legal deprivation of liberty rights, such as the right to vote, it essentially affects the conservatee’s rights to enter into contracts.[14] Moreover, although the conservatee is not technically deprived of her property, she is clearly deprived of the right and ability to control that property. Numerous commentators have suggested that this deprivation is similar to, and as serious as, the actual deprivation of property rights which the Constitution already protects. (See, e.g., Atkinson, Towards a Due Process Perspective in Conservatorship Proceedings for the Aged, 18 J Fam L 819, 836-837 [1980].)
Deprivation of the right and ability to manage one’s assets may also have a substantial, and sometimes a controlling impact on liberty rights, including the choice of where to live, the choice to refuse medication (Rivers v Katz, 67 NY2d 485 [1986]), or medical treatment, and the choice not to be involuntarily admitted to an institution.[15] An aged or infirm person who is incapable of managing her assets will, without resources, find it difficult indeed to exercise her liberty rights in the face of a conservator who uses those assets to do what is "best” for the conservatee,[16] particularly when it is so fre *338 quently determined that commitment to a nursing home is necessary.
It is undoubtedly for these reasons, given the gravity of the liberty and property interests at stake, that the Legislature has imposed the heavy evidentiary burden of requiring proof by clear and convincing evidence. (See, e.g., Santosky v Kramer, 455 US 745 [1982].) Such evidentiary protection is, in and of itself, inadequate as a matter of due process if there is no relation between that which must be proved and the interference with liberty which the State then imposes. That is to say, the finding that a person cannot handle her finances is simply inadequately related to a person’s ability to make other decisions about her life, including health care decisions, to deprive her of the right to make such decisions.[17] This is why, as our Court of Appeals has held, even the determination of incompetency necessary for an involuntary mental commitment is insufficient to automatically remove the right of the committed patient to refuse antipsychotic medication.[18]
Accordingly, the concurrent determination of impairment in the management of one’s affairs and of need for an appointment of a conservator can and should, constitutionally, be *339 only that and no more.[19] The unfortunate tendency of courts,[20] litigators,[21] and commentators[22] to treat the conservatorship statute as something more must be resisted both as a matter of statutory intent and constitutional compulsion. Thus, the appointment of a conservator cannot be deemed the appointment of a surrogate health care or other decision maker for the conservatee.[23] Where the real issue involved is an individual’s liberty, as opposed to management of property, article 78, and only article 78, permits the necessary factual determination of incompetency and appointment of a surrogate decision maker.[24]
*340 Finally, completing this brief review of constitutional limitations on the State’s ability to invade an impaired or elderly person’s liberty or property rights, it should be noted that where there are questions about an existing statute, it is the court’s obligation to read the statute consistently with constitutional principles. (See, e.g., Matter of Scopes, 59 AD2d 203, 205-206 [3d Dept 1977] [reading "dangerousness” into Mental Hygiene Law § 9.27 in accordance with the minimal constitutional standards required by O’Connor v Donaldson, 422 US 563]; Matter of Harry M., 96 AD2d 201, 206, 208 [2d Dept 1983] [reading a dangerousness and least restrictive alternative requirement into Public Health Law article 15 because "the law is somewhat in a state of flux” and holding that a charge to a jury using the " 'exact statutory language might mislead the jury’ ” as to the ultimate issues].)
Thus, regardless of any ambiguity which might exist because of the 1974 amendment to section 77.19 or the 1981 amendment to the Public Health Law, I hold that the statute only permits the appointment of a conservator upon a clear and convincing showing of the proposed conservatee’s impairment in her ability to manage her assets, and that such conservator has only those powers necessary to manage the assets of the conservatee for her benefit.[25]
Thus the request that an order directed towards the forced acceptance of a home health care worker cannot be granted in accordance with the statute, both for the constitutional reasons discussed above, and because as a matter of statutory and case law a court can act with regard to a conservatee or incompetent only through a conservator or committee, and not independently. (See, Matter of Wolinsky, 101 AD2d 866 [2d Dept 1984].)
CONCLUSION
Applying the principles of law to the hearing testimony and *341 my observations of Ms. Fisher, I cannot find that petitioner has met its burden of showing that Ms. Fisher’s ability to manage her funds is so impaired as to require the appointment of a conservator. Certainly the petitioner has not met the clear and convincing burden, nor is it certain even a preponderance of the evidence would have indicated Ms. Fisher’s inability to manage her finances.
Whether she is managing her life well, or whether she is acting in a way inimicable to her own best interest is a different question. However, it is not a question properly before the court in an article 77 proceeding.[26] Whether or not a conservator might employ Ms. Fisher’s funds in a different way, or impose upon her more effectively to accept the service which she may need to maximize her health and safety, and which I personally believe would substantially improve the quality of her life, are not the issues here. It is not for this court, consistent with the statute and the Constitution, to make such an imposition and deprivation of her property rights simply because it would be "in her best interest.”
The integrity of the elderly, no less than any other group of our citizens, should not be invaded, nor their freedom of choice taken from them by the State simply because we believe that decisions could be "better” made by someone else. If Ms. Fisher is really "incompetent” to manage her own affairs, or if she can be shown to be a danger to herself or others, and if the burden of making the showing can be carried by clear and convincing evidence, including a determination of these facts by a jury, if requested, then the State can intervene in the manner which has been urged in this proceeding. Until that occurs, she must be permitted to make her own decisions, whether good or bad, wise or foolish, as a condition of the liberty and integrity accorded all other citizens who have not been declared legally incompetent.
The petition is, accordingly, dismissed.
[Portions of opinion omitted for purposes of publication.]

. This petition was brought either while Ms. Fisher was still at Lenox Hill or shortly after her transfer to the nursing home.

. There was no indication at this hearing or from any other evidence that Ms. Fisher did not pay her bills on time.

. The legal argument for conferring such powers upon a conservator is discussed infra.

. In most other jurisdictions what is referred to in New York as a "Committee” is called a "Guardian.” (See generally, 1966 Report of NY Law Rev Commn, at 281-323 [discussion contrasting conservatorship and guardianship].)

. As early as 1962, the Association of the Bar of the City of New York and Cornell Law School included among their many recommendations concerning mental illness and due process a proposal for legislation authorizing management of the property of individuals whose mental illness was insufficiently serious to require hospitalization, but who were nevertheless incapable of effectively managing their property. (Special Committee to Study Commitment Procedures of Association of Bar of City of New York, Report and Recommendations on Admissions to Mental Hospitals Under New York Law, Mental Illness and Due Process, 212-219 [1962]; see generally, 1966 Report of NY Law Rev Commn, at 283-340; Note, Legislation: The New York Conservator Law, 22 Buffalo L Rev 487, 488-489 [1973].)

. For example, the statute specifically provides that the conservatee’s civil rights are not affected by the appointment of a conservator. (Mental Hygiene Law § 77.25 [a]; see, Moore, The Durable Power of Attorney as an Alternative to the Improper Use of Conservatorship for Health care Decision Making, 60 St. Johns L Rev 631, 636 [1986]).

. The general practice appears to be the waiver of the proposed conservatee’s presence upon so little as a physician’s affidavit, or the testimony of a physician that the person would not understand or would not be able to participate in the hearing. Commentators criticize the ease with which a proposed conservatee’s presence is dispensed with, since the requirement of presence is, among other things "an important protection against overreach *334 ing by persons who want effective control of the conservatee’s property.” (Strauss and Wolf, New York Law of Conservatorship, NYLJ, Jan. 31, 1986, at 1, col 1, at 2, col 2; see, Matter of Berman [Losch] 61 AD2d 902 [1st Dept 1978] [court, not G.A.L. who has seen proposed conservatee only once, is the proper source of the decision as to whether the proposed conservatee was too ill to attend the hearing].)

. Unfortunately, although guardians ad litem are appointed to protect the "rights and interests” of the proposed consérvateos in the process, this role is largely undefined. Courts in the past have alternated between describing the role of the G.A.L. as "representing” and also "protecting the rights and interests” of the proposed conservatee. (See, Matter of Young, 79 Misc 2d 208 [Dutchess County 1974]; Becan v Driver, 26 AD2d 44 [1st Dept 1966]; Matter of Berman, 24 AD2d 432 [1st Dept 1965].) G.A.L.s tend not to see themselves as "representing” the proposed conservatee’s "spoken choice” but as representing the "best interests” of the proposed conservatee and thus often leaving the desires of the proposed conservatee unrepresented in the process. (See, Dubler and Zuckerman, Discharge Planning for Elderly Patients of Diminished Capacity: Legal Issues and Options, at 61 [1986].)

. The legislative, history accompanying the 1974 amendments to the Mental Hygiene Law reaffirmed the statute’s continuing its emphasis on the property management aspects of the conservatorship, distinguishing carefully between the roles of committees and conservators. (See, mem of State Executive Dept, 1974 McKinney’s Session Laws of NY, at 1984 [this memorandum stated:
"The Mental Hygiene Law provides two methods of protecting a person whose ability to manage his own affairs is impaired * * *. Of these, the conservatorship is less restrictive of the freedom of the individual.
"A declaration of incompetency and an appointment of a committee strips a person of control over both his person and his property.”]; see also, Governor’s mem, 1974 McKinney’s Session Laws of NY, at 2093; mem of Sen Giuffreda, 1974 NY Legis Ann, at 176,179.)

. Clearly the amendment to the Public Health Law relates only to patients who are already in hospital facilities, and thus would be inapplicable in a situation such as this in which a conservator is sought in the first instance for a person living in the community. The point in the discussion of the amendment is, however, the widespread belief that the conservator possesses additional powers under the rubric of providing for the conservatee’s "personal well being.”

. Public Health Law § 2803-c (3) (j); see, e.g., 1984 Opns Atty Gen 61, n ("A conservator * * * may be judicially appointed to act as a patient’s health care representative”).

. The Law Revision Commission has stated: "The word 'conservator’ should be deleted from * * * section 2803-c (3) (j) of the Public Health Law because the inclusion of the word 'conservator’ in [this] statute * * * was the result of either inadvertence or mistake rather than a deliberate legislative decision to expand the powers of the conservator so that they are the equivalent of those of a committee of a person.” (1988 McKinney’s Session Laws of NY, at 1791.)

. The Court of Appeals has also relied on the New York Constitution in requiring basic due process protections in the case of civil commitment. (See, Matter of Kesselbrenner v Anonymous, 33 NY2d 161 [1973]; NY Const, art XVII, §4.) This is consistent with a general trend, which can be expected to increase given the Supreme Court’s rightward turn, to look to State Constitutions for basic due process protections, including rights for the mentally disabled. (See, e.g., Perlin, State Constitutions and Statutes as Sources of Rights for the Mentally Disabled: The Last Frontier, 20 Loyola LA L Rev 1249, 1283-1292 [1987].)

. One commentator has suggested that a conservatee has no ability to enter into a binding contract of marriage. (See, Atkinson, Towards a Due Process Perspective in Conservatorship Proceedings for the Aged, 18 J Fam L 819, 829 [1980].)

. The majority of constitutional cases dealing with involuntary confinement concern commitment of civilians (see, e.g., O’Connor v Donaldson, 422 US 563 [1975]) or prisoners to mental hospitals. (See, e.g., Vitek v Jones, 445 US 480 [1980].) These cases have described involuntary commitment to a mental institution asa" 'massive curtailment of liberty’ ” (supra, at 491), constituting an even more intrusive exercise of State power than incarceration following a criminal conviction.

. In an analogous context, the Ninth Circuit has held that a mandatory review provision must be employed after the involuntary commitment of a "gravely disabled” person under California law, since the availability of habeas corpus, initiated by the patient, is inadequate. The court observed that many members of the protected class could not "realistically be expected to set the proceedings into motion” for many reasons including *338 sedation, inhibition based on surroundings, intimidation or distrust of staff, or, as might particularly be the case with a conservatee, a sense of obligation to cooperate with "the [person] who will control nearly every aspect of his life for some period of time”. (Doe v Gallinot, 657 F2d 1017, 1023, n 7 [9th Cir 1981].)

. The fact that someone else might, or could make better choices is not the point. In a constitutional system such as ours which prizes and protects individual liberties to make decisions, even bad ones, the right to make those decisions must be preserved. As Dean Alexander writes: "The elderly population * * * suffers from the often glaring discrepancy between majoritarian and individual evaluation of benefit. An older person may, for example, wish to remain at home even under conditions which may endanger health and safety, rather than live in the more protected environment of an institution. 'The place where one lives is profoundly connected to who one is and how one expresses this sense of self * * * Many older people also associate home with autonomy and control.’ Hence, for the aged, the benevolence of others may directly produce dependency, depression and even death.” (Alexander, Remaining Responsible: On Control of One’s Health Needs In Aging, 20 Santa Clara L Rev 13, 21 [1980].)

. The Court of Appeals recognized a "continuum of capacity”, which applies equally to elderly persons. It wrote: "Indeed, it is well accepted that mental illness often strikes only limited areas of functioning, leaving other areas unimpaired, and consequently, that many mentally ill persons retain the capacity to function in a competent manner * * * including the fundamental right to make decisions concerning one’s own body”. (Rivers v Katz, 67 NY2d 485, 494.)

. The constitutionality of the conservatorship procedure has been questioned by many commentators. (See, e.g., Atkinson, Towards a Due Process Perspective in Conservatorship Proceedings for the Aged, 18 J Fam L 819, 836 ["The due process required in * * * New York or under the Uniform Probate Code does not satisfy constitutional requirements”]; Sherman, Guardianship: Time for a Reassessment, 49 Fordham L Rev 350, 351-352 [1980].) The issue of what procedural due process is required is, however, not, presented by this case. The Law Revision Commission is again considering modification of the conservatorship and committee statutes, and in the process of conducting hearings and collecting information has shown itself sensitive to these due process issues. It is to be hoped that the resulting proposals will satisfy both State and Federal Constitutions in all aspects of procedural due process.

. For example, judicial opinions sometimes refer to conservatees as "incompetent,” ignoring the distinction in the statute between Mental Health Law article 77 and article 78 determinations. (See, e.g., Matter of Scrivani, 116 Misc 2d 204, 206, 210 [Sup Ct, NY County 1982]; see generally, Moore, The Durable Power of Attorney as an Alternative to the Improper Use of Conservatorship for Health-Care Decision Making, 60 St. Johns L Rev 631, 647-652 [1986].)

. This court frequently receives requests from attorneys for petitioners and/or conservators to make placements, generally to nursing homes, without any indication of the consent of the proposed or actual conservatee. (Cf., Matter of Detzel, 134 AD2d 205.)

. See, e.g., Hall Appointment of a Conservator: A Useful Tool, 58 NY St BJ 29 (1986) (refers to conservatee as "incompetent” and describes conservatorship as "special judicial proceeding to deal with incompetency cases in a dignified and less offensive manner”); see also, Federman, Conservatorship: A Viable Alternative to Incompetence, Fordham Urban LJ 815, 816 (1986) (describing the conservatorship law as "the best alternative currently available for the care and maintenance of impaired elderly people”).

. For example, the right to make life and death medical care decisions cannot be delegated to a physician even where the proposed treatment is necessary to preserve the individual’s life. (See, Matter of Storar, 52 NY2d 363, 377 [1981], cert denied 454 US 858 [1981].)

. It is not clear after Rivers v Katz (67 NY2d 485), whether even a Mental Hygiene Law article 78 determination would permit the involuntary administration of antipsychotic drugs to an incompetent for whom a com *340 mittee has been appointed, solely on the delegation of that power to physicians or other health care professionals by the committee. (See, Matter of Guardianship of Roe, 383 Mass 415, 421 NE2d 40 [1981] [finding constitutionally protected right for mentally ill but noninstitutionalized individual for whom a guardian had been appointed to refuse treatment with antipsychotic drugs].)

. The constitutionally proper way of reading the statute, even with its ambiguity, is to see the words "for her benefit” as limiting the conservator’s power to spend the assets of the conservatee, not granting an independent power to act on behalf of the conservatee’s best interest.

. Such determination can, as I have held, only be made in an article 78 proceeding. Since my determination of this petition, but prior to publication of this opinion, such a proceeding has been commenced.