OPINION OF THE COURT
 

 Bellacosa, J.
 

 Seena Rose (Respondent) is a 59-year-old artist who has lived and worked in the same New York City apartment for 25 years. The Commissioner of Social Services of the City of New York (Commissioner) brought this proceeding to appoint a conservator of Respondent’s property pursuant to article 77 of the Mental Hygiene Law after she fell behind in her rent and utility payments. Relying essentially on testimony that Respondent suffers from a mental illness, Supreme Court, New York County, appointed a conservator with authority to manage her assets and to commit her to a nursing home "when medically indicated”.
 

 On her appeal to the Appellate Division, Respondent argued that Mental Hygiene Law § 77.19, which sets forth the powers and duties of conservators, does not authorize empowering conservators to commit their wards to nursing homes. She also argued that a conservator should not have been appointed for her because the Commissioner failed to prove that her ability to care for her property was substantially impaired. The Appellate Division modified the Supreme Court order only to the extent of requiring court approval prior to
 
 *706
 
 commitment to a nursing home, and otherwise affirmed. This Court granted Respondent leave to appeal. We now reverse and dismiss the petition. Section 77.19 of the Mental Hygiene Law does not authorize conservators to take the profound action of committing their wards to nursing homes. Moreover, the Commissioner did not satisfy the procedural and evidentiary requirements of Mental Hygiene Law § 77.01 (1) for the appointment of a conservator of Respondent’s property.
 

 Like many artists the world over and across the centuries, Respondent has managed her life on a limited income. Her only sources of income are monthly Social Security benefits supplemented by a small sum from her ex-husband. The stabilized rent on her six-room Manhattan apartment is $671 per month. Her works of art, composed in various media, virtually fill her apartment. Because her oeuvre has never been publicly shown or sold, appraisal of the value of the whole or individual items is apparently impossible.
 

 For undeveloped reasons, Respondent fell four to five months behind in her rent and utility bills in early 1987. A caseworker from the Department of Social Services (DSS) Protective Services of Adults visited her and arranged to pay the arrears by obtaining "special rent” from the DSS. At some point, her landlord had agreed to participate in a Federal program to subsidize a portion of her rent, but he later refused (see, United States Housing Act of 1937, ch 896, § 8; 42 USC § 14370.
 

 Respondent apparently paid her rent in a timely manner from mid-1987 until May 1988, when she again fell into arrears. On July 28, 1988, the Commissioner petitioned Supreme Court for an order pursuant to article 77 of the Mental Hygiene Law "appointing a conservator of the property of Seena Rose on the grounds that she is no longer able to manage her property.” The petition suggested that "the appointed conservator should negotiate the appraisal and sale of her artwork and manage her finances for their protection and best use. Placement in a protective setting will be needed if no financial arrangements can be made so that [she] can remain in her current apartment, and she refuses to accept other housing.” Attached to the petition was an affirmation by Grace Gorham, M.D., a psychiatrist who interviewed Respondent in her home on June 25 and October 1, 1987 at the request of the DSS. In her affirmation, Dr. Gorham describes Respondent’s medical condition and current psychiatric treat
 
 *707
 
 ment, diagnoses her as a schizophrenic, and concludes that she is "entirely unable to manage the ’system’ ” and is "unable to find housing on her own, unable to handle court proceedings, unable to apply for entitlements or any activity requiring long range planning.”
 

 Dr. Gorham also testified at the hearing held on October 20, 1988 and repeated the allegations made in her affirmation: that Respondent is a schizophrenic who is "incapable of managing any kind of activities requiring long-range planning, such as her finances, promoting herself.” The guardian ad litem appointed by Supreme Court recommended that a conservator be appointed because Respondent "seems incapable of making any decision of what to do with [her] art work”, is "unable to do anything to generate any income for herself, or to attempt to do it, that is, to sell her art work,” and "is not self-supporting”. The guardian admitted that if Respondent were "capable of getting out of her apartment to try to sell her art work or perhaps to get a job” there would be no need for a conservator.
 

 The DSS caseworker who visited Respondent on a monthly basis testified that her ability to pay her rent was "a constant problem” and that unsuccessful efforts had been made to obtain funding from several agencies and to arrange a showing for the artwork. She testified that Respondent told her on several occasions that she could not part with her work because it would be "like parting with a limb of her body.” The DSS had concluded that appointment of a conservator with "the legal power to go out and to get those people who could appraise the work, who could see if it could be converted to cash * * * would enable her to stay in the apartment”.
 

 Respondent was present at the conservatorship hearing but was not represented by counsel. She testified that she had been "consistently reassured” that she would obtain a "section 8” Federal rent subsidy, and that if she had not anticipated the subsidy, she would have fixed up a room in her apartment and rented it to supplement her income.
 

 Based on the petition papers and the hearing testimony, the Supreme Court concluded that Respondent "has suffered substantial impairment of her ability to care for her property and has become incapable of managing her affairs” and appointed a conservator for an indefinite duration. The court granted the conservator authority to oversee "all of the property, assets and income of Seena Rose, both real and personal; including
 
 *708
 
 the following provisions for the necessary personal and social protective services to the conservatee: the conservator will marshal the assets of the conservatee and administer, conserve or reinvest them as is appropriate.” Apparently in response to the Commissioner’s suggestion that placement in a "protective setting” might become necessary, the court added that "[t]he conservator shall have the power to, when medically indicated, transfer the conservatee to an appropriate nursing care facility. The conservator shall make sure that the conservatee receives the necessary and adequate skilled medical service, treatment and attention required by her diagnosed mental condition. The conservator shall also have the power to execute on behalf of the conservatee any admission form or any other documentation required to accomplish the acts which are herein required from it in behalf of the conservatee.”
 

 The Appellate Division agreed with the nursing home commitment authorization, but modified it only to require additional court approval prior to nursing home placement. The Appellate Division also agreed with the Supreme Court that the "record amply demonstrates that [Respondent] needs help in managing her property” and is "unable to cope with her financial peril by taking advantage of the potential value of her artwork”, and affirmed the order appointing the conservator (162 AD2d 253, 254).
 

 Appointment of a conservator significantly compromises individuals’ rights to manage and control their property. Consequently, the law imposes a high and heavy burden of clear and convincing proof on the person or governmental entity seeking such officially sanctioned interference (Mental Hygiene Law § 77.01 [1];
 
 see, Matter of Waxman,
 
 96 AD2d 906;
 
 Matter of Kraft,
 
 60 AD2d 548). Mental Hygiene Law § 77.01 (1) (a) authorizes the appointment of a conservator of property only "for * * * residents] who [have] not been judicially declared incompetent and who by reason of advanced age, illness, infirmity, mental weakness, alcohol abuse, addiction to drugs, or other cause, [have] suffered
 
 substantial impairment of [their] ability to care for [their] property
 
 or [have] become unable to provide for [themselves] or others dependent upon [them] for support” (emphasis added).
 

 We address at the threshold the Commissioner’s argument that Mental Hygiene Law article 77 authorizes courts to grant conservators the power to commit their wards to nursing
 
 *709
 
 homes where conservatees’ "well-being” so requires. Article 77 of the Mental Hygiene Law was passed in 1972 to establish "a procedure to
 
 preserve the property
 
 of persons who are unable to manage their own affairs either because of debilitating factors which create a condition falling short of incompetency or, if actual incompetency exists, where there is a disinclination to initiate a proceeding [under Mental Hygiene Law art 78] to declare such incompetency because of the stigma” that attaches (Mem of Joint Legis Comm on Mental and Physical Handicap, 1972 McKinney’s Session Laws of NY, at 3277, 3290 [emphasis added]). In their report to the Legislature, the drafters of the conservatorship statute stressed their intent that the "remedy [be] limited to the property of a conservatee and [have] no effect upon [the conservatee’s] person” (1966 Report of NY Law Rev Commn, at 263, 271, reprinted in 1966 McKinney’s Session Laws of NY, at 2842).
 

 The enacted language of article 77 reflects the Legislature’s intent to limit the scope of a conservator’s power only to the conservatee’s property. Section 77.01 is entitled "Persons for whom a conservator
 
 of the property
 
 may be appointed”, and authorizes the appointment of "one or more conservators
 
 of the property”
 
 (§ 77.01 [1] [emphasis added]). Section 77.19 states that a conservator appointed under article 77 "shall have all of the powers and duties granted to or imposed upon a committee
 
 of the property”
 
 appointed under Mental Hygiene Law article 78, to be distinguished from a committee of the person (emphasis added).
 

 The Commissioner argues, and the courts below agreed, that Mental Hygiene Law § 77.19 authorizes courts to empower conservators to involuntarily commit their wards to nursing homes. The statute states in part that "the court order appointing a conservator shall set forth * * * [a] plan for the preservation, maintenance, and care of the conservatee’s income, assets and
 
 personal well-being,
 
 including the provision of necessary
 
 personal and social protective services
 
 to the conservatee.”
 

 The legislative history, however, does not support the Commissioner’s expansive reach. The quoted language was added to section 77.19 in 1974 in conjunction with the addition of language to Mental Hygiene Law § 77.03 to authorize social services officials and public agencies to petition for and serve as conservators. Prior to amendment, section 77.03 authorized only relatives, friends, certain hospital and school officers and
 
 *710
 
 conservatees themselves to commence a proceeding to appoint a conservator. The Legislature’s intent was to ensure that "older person[s] without close relatives or friends [are able to] function^ in the community,” while "protecting their independence and right to manage their own property and personal affairs to the greatest possible extent” (Mem of Senator Giuffreda, 1974 NY Legis Ann, at 176, 178). Upon signing the bill, the Governor stated that it would "enabled the conservator to assume a
 
 limited role
 
 in protecting the personal well being of the conservatee” (Governor’s Approval Messages, at 53-59, reprinted in 1974 NY Legis Ann, at 397, 399 [emphasis added]).
 

 Assuming, without deciding, that Mental Hygiene Law § 77.19 authorizes a grant of limited power over a conservatee’s person incidentally related to the primary power over property
 
 (see, e.g., Matter of Evelyn P.,
 
 135 AD2d 716), we conclude that it clearly does not authorize the potent personal transformation of involuntary commitment of a conservatee to a nursing home
 
 (see, Matter of Detzel,
 
 134 AD2d 205;
 
 see also,
 
 Moore, The Durable Power of Attorney as an Alternative to the Improper Use of Conservatorship for Health-Care Decision Making, 60 St John’s L Rev 631, 638-653 [1986]). The availability of such a significant involuntary displacement of personal liberty should be confined to a Mental Hygiene Law article 78 incompetency proceeding, with its full panoply of procedural due process safeguards
 
 (see, Rivers v Katz,
 
 67 NY2d 485;
 
 Matter of Detzel, supra; Matter of Fisher,
 
 147 Misc 2d 329, 339). Both courts below erred, therefore, in extending the beneficial reach of Mental Hygiene Law § 77.19 beyond its central property and incidental personal borders.
 

 The courts below also erred in concluding that Respondent was substantially unable to manage her property and that a conservator was therefore needed. In this respect, we can examine only whether there is any evidence in the record to sustain that affirmed finding (Cohen and Karger, Powers of the New York Court of Appeals § 108, at 452 [rev ed];
 
 Alpert v 29 Williams St. Corp.,
 
 63 NY2d 557, 574). We conclude that there was not.
 

 The testimony at the hearing focused on the nature of Respondent’s alleged mental condition, how it manifested itself in her artwork, and what the proper treatment for the condition should be. The Supreme Court concluded that Respondent "requires severe medical treatment,” and "if I ap
 
 *711
 
 point a conservator and the conservator confers with you [Dr. Gorham], you can then tell [the conservator] she requires an examination by a psychiatrist, or by doctors to give a report, a hospital. That’s what a conservator is there for.” Mental illness, however, is relevant to the inquiry under Mental Hygiene Law § 77.01 (1) only to the extent the illness causes
 
 "substantial
 
 impairment of [consérvateos’] ability to care for [their] property or * * * provide for [themselves] [emphasis added].” That precise causal connection was not established here under the high "clear and convincing” evidentiary standard.
 

 Critically, there was an absence of proof concerning Respondent’s spending patterns, her ability to budget and allocate her concededly limited resources, or her knowledge of her existing accounts payable, their balances, and her income. Nor was there any evidence of waste or mismanagement of resources. On the contrary, Respondent’s own testimony that she was relying on an expected Federal rent subsidy in lieu of other solutions shows her reflective competence, awareness and weighing of her precarious financial situation. The evidence of personal behavior and the nature of her artwork do not support a finding of substantial impairment. Indeed, Dr. Gorham’s suggestion that Respondent suffered from an inability to manage the "system” and to handle "court proceedings” seems oddly irrelevant and fatally general. In sum, the only evidence which was extrapolated to leap to the suggestion that Respondent needed help managing her property was her periodic failure to timely pay rent and utility bills. The evidence suggests, however, that this circumstance was more likely due to meager means, rather than to relevant mental incapacity of the level required by the statute.
 

 The courts below further based their finding of impaired ability on Respondent’s failure to attempt to market her artwork to remedy her periodic financial deficiencies. An artist’s personal refusal to sell artwork, however, hardly warrants subjugation to a conservator when the artist happens to fall behind in rent payments or other bills. If that were the qualifying test, many people temporarily or regularly suffering penury might be threatened by the paternalism of the law and its well-intentioned ministers.
 

 Respondent has survived for 25 years in the same apartment on her limited income. It may be true, as the Commissioner alleges, that her artwork is valuable and that selling it
 
 *712
 
 could alleviate some of her financial pressures. However, as the Supreme Court itself recognized, "a conservator is not [appointed] to peddle art around to see if it can be sold or to overcome the frustration of an artist * * *. That’s not the job of a conservator.” We note that alternatives short of appointing a conservator exist in this case to aid in preventing Respondent’s eviction, including possible participation in the United States Housing Act of 1937 section 8 Federal rent subsidy program. Appointment of a conservator, with its consequent affront to the integrity and independence of the individual, even where warranted, ought to be among the last alternatives in these dire circumstances and cases.
 

 The Mental Hygiene Law represents the Legislature’s response to a perceived and empirically documented societal need. The vocation of individuals should neither immunize them from nor make them preferred candidates for protections afforded by the Mental Hygiene Law. On the record before us, however, Respondent was not proven to require the statute’s protective services. The Supreme Court and the Department of Social Services, despite their undoubtedly good intentions in this case, may not substitute themselves for Respondent’s muse and order her art sold against her wishes. While personal and artistic rights are not absolute, they may not be lightly trumped in this fashion. On this record and perhaps only for the time being, Respondent must be left alone with her art because the law’s evidentiary and procedural barriers have not been overcome.
 

 Accordingly, the order of the Appellate Division should be reversed, with costs, and the proceeding dismissed.
 

 Chief Judge Wachtler and Judges Simons, Kaye, Alexander, Titone and Hancock, Jr., concur.
 

 Order reversed, etc.