*173 OPINION OF THE COURT
Eve Preminger, S.
This is an application for the appointment of a conservator for the property of Susan Ellen Wargold (Susan), pursuant to article 77 of the Mental Hygiene Law. Susan is the sole distributee of the estate of her father, Maurice Wargold, whose estate is being administered by the Public Administrator.
The Public Administrator alleges that due to Susan’s mental infirmity she is unable to manager her property. A hearing was held on April 10 and 25, 1991. Susan failed to appear at the April 10 hearing. She did appear, however, at the April 25 hearing.
The testimony by Dr. Deutsch, a psychiatrist who had treated Susan, adduced the following:
Susan, who is in her early forties, was brought by ambulance to Cabrini Medical Center on April 5, 1990. She was admitted to the psychiatric unit. Her hospital records indicate her hospitalization was due to her bizarre and violent behavior.
Dr. Deutsch, the director of in-patient services at Cabrini Medical Center, could not make a definite diagnosis. It was difficult to ascertain whether Susan’s bizarre behavior was attributable to schizophrenia or to her prior extensive drug use or both, although Dr. Deutsch thought it "highly likely,” that Susan was a schizophrenic.
Three months later, on July 17, 1990 Susan was discharged. She had remarkably improved and continued to see Dr. Deutsch approximately once a month for about six to eight months. (At the time of the hearing Susan had changed psychiatrists.) A social worker from the Cabrini Medical Center also worked extensively with Susan and discussed Susan’s progress with Dr. Deutsch.
Dr. Deutsch testified that since Susan’s discharge he has not seen or been made aware of any violent or bizarre behavior by Susan. She attended her appointments and dressed appropriately. She appeared to be eating well and taking care of her basic needs. She purchased and took her medications. Her dose of Thorazine was lowered from a high of 800 milligrams to 250 milligrams. Dr. Deutsch concluded, however, that "there are oddnesses and eccentricities and evidence of poor judgment all over the place.”
Susan’s testimony adduced the following:
*174 Susan rents a room in the Gramercy Park Hotel for $1,758 per month. This is intended as a temporary residence until she succeeds in being reinstated in her mother’s former apartment. She lives with a disabled veteran who gives her his monthly disability check and she pays for his room and board.
Susan spends around $600 per week on food. She either eats in a restaurant or orders from room service. She purchased a car for $1,200 and paid $80 to garage it for five days. She testified that she intends to purchase a sports car. She testified that she needs $5,000 to buy summer clothes.
Susan testified that she has a checking and savings account at Bankers Federal Savings Bank. She was able to give the correct balance in both accounts. She cashes checks daily in the hotel. She pays her rent and phone bills by check and purchases most other items with cash.
Susan’s guardian ad litem provides her with $7,500 every six weeks from her father’s estate. Susan testified that she has "handled it very nicely” and keeps "track of every month that’s com[ing] to [her].”
Susan admitted that she is incapable of choosing investments without assistance. She intends to retain a financial advisor to aid her. The thought of making investments without assistance is "very frightening. I don’t have any knowledge of that. I would have to get an expert, hire somebody to tell me what’s a good investment; and then I would have to ask him how much they are making on me first. That’s number one.” She asserted, however, that she wants all investments discussed with her and does not want any property sold. She does not trust or desire anyone to make final decisions for her.
The Legislature has recognized that some individuals may not be able to manage their finances, yet are not sufficiently incapacitated to justify a declaration of incompetence. (Matter of Fisher, 147 Misc 2d 329, 332.) Article 77 of the Mental Hygiene Law was enacted to provide for the appointment of a conservator to preserve the property of those persons while leaving intact any of their civil rights or other choices which might be lost as a result of a declaration of incompetency.
While the appointment of a conservator deprives an individual of fewer rights than a declaration of incompetency, it still strips an individual of the basic right to control the disposition of his or her own property. There is a heavy burden on the entity seeking the conservatorship. (Matter of Grinker [Rose], *175 77 NY2d 703.) A petitioner requesting the appointment of a conservator must present clear and convincing proof of the need for a conservatorship. (Mental Hygiene Law § 77.01 [1]; see also, Matter of Grinker [Rose], supra; Matter of Bailey, 46 AD2d 945 [3d Dept 1974].) The need for a conservator exists only when an individual has "suffered substantial impairment of his ability to care for his property” as a result of "advanced age, illness, infirmity, mental weakness, alcohol abuse, addiction to drugs, or other cause”. (Mental Hygiene Law § 77.01 [1] [a] [emphasis added].)
The Public Administrator contends that there has been presented clear and convincing proof that Susan suffers substantial impairment of her ability to care for her property. This court disagrees. Although Susan has exhibited somewhat volatile and explosive personality traits, nothing in her present demeanor or in the testimony about her current behavior demonstrates that she is incapable of managing her daily financial affairs. Indeed she has been so managing since her release from the hospital over a year ago. It is true that Susan requires an investment advisor and she has indicated her desire to hire a financial "expert” to assist her in making investments. But more than such dependence is required before persons are stripped of the power to make their own financial decisions.
Petitioner contends that Susan’s interruptions and outbursts during the hearing reflect her inability to communicate with an investment advisor. However, even assuming that her behavior at the hearing may indicate that she could have difficulties working with a financial advisor, it does not clearly and convincingly evidence that she will be unable to do so. Indeed, Susan appears to have successfully interacted with her guardian ad litem.
If Susan were incapable of budgeting her short-term expenses and incapable of caring for her basic needs, a conservator might then be necessary. Petitioner, however, has failed to present clear and convincing evidence of such a situation. From Dr. Deutsch’s and Susan’s testimony at the hearing it appears that Susan can manage her day-to-day affairs. She has vastly improved since her hospitalization. She cares for her basic needs. She sees her psychiatrist regularly. She purchases and takes her medications. She pays her bills on time. She appears to be aware of her expenses as well as her assets.
*176 While Dr. Deutsch testified with regard to Susan that "there are oddnesses and eccentricities and evidences of poor judgment all over the place,” he failed to offer examples to support this belief. Furthermore, oddities and eccentricities are unlikely to constitute grounds for a conservatorship. (See, Matter of Grinker [Rose], supra, where the Court of Appeals rejected a conservatorship for a 59-year-old artist who refused to sell her artwork despite falling behind in rent and utilities payments.)
As to Susan’s alleged poor judgment, Dr. Deutsch failed to cite examples of such conduct. Petitioner points to Susan’s purchase of a car for $1,200, spending $80 to garage it for five days, and her intent to purchase a sports car next year as examples of her poor judgment with regard to spending. None of those acts, however, are so shocking as to demonstrate clearly and convincingly Susan’s substantial impairment of her ability to manage her assets. Nor is it the court’s function to regulate improvident expenditures in the absence of substantial impairment.
In many respects Susan seems to be frugal. She expressed considerable anger at the fees charged to her by her lawyer and psychiatrist. In fact, she claimed she switched lawyers and psychiatrists, at least in part, due to their high fees. She stated that the first issue in choosing a financial advisor is "how much [they] are making on me.” She was upset over paying high rent to the hotel when she feels she should be permitted to live in the apartment from which she was thrown out prior to her discharge from Cabrini Medical Center.
It is not disputed that the facts in the instant case do raise the suspicion or possibility that Susan may not be able to manage her assets even with the assistance of a financial advisor, and that her assets will be depleted more quickly than those of the most prudent person. Such a suspicion, however, does not meet the heavy burden of proof required by the Legislature before it will sanction State encroachment upon an individual’s right to control her own property. The need for a high standard is particularly relevant to the instant case where the proposed conservatee has emphatically asserted that she desires to maintain ultimate control over her property and intends to seek financial assistance in managing her assets. As the New York Court of Appeals stated: "Appointment of a conservator, with its consequent affront to the integrity and independence of the individual, even where *177 warranted, ought to be among the last alternatives in these dire circumstances and cases.” (Matter of Grinker [Rose], 77 NY2d, supra, at 712.)
There remain areas of concern to this court with respect to Susan’s condition. The guardian ad litem submitted a post-hearing affirmation stating that Susan spends the funds allocated to her "in a relatively short time and requests additional funds almost immediately, even though she has been instructed that these funds must last six weeks.” He also claims that Susan purchased a car with money that she knew had been allocated for food and lodging. These contentions, however, have not been aired at a hearing.
Furthermore, since Susan’s guardian ad litem supports the application for a conservator, Susan is left without anyone to represent her avowed interest. Where such a dichotomy exists, prior to depriving the proposed ward of control over her property, counsel should be appointed to advocate her objections. (See, Matter of Fisher, supra, at 334, n 8; Spring and Dubler, Conservatorship in New York State: Does it serve the Elderly?, 45 Record of Assn of Bar of City of NY 288, 318-319 [1990].) Thus, if either the Public Administrator or the guardian ad litem choose to make a new application for a conservator, as they are free to do, based on either the facts alleged in the guardian ad litem’s affirmation or any other facts which would make a fuller record, additional counsel should be appointed to represent Susan’s objections.
Accordingly, for the reasons stated, the petition for the appointment of a conservator for Susan is denied.