OPINION OF THE COURT
Aileen Haas Schwartz, J.
Are due process commands stilled and superseded by the Hippocratic Oath in testing the legality of psychiatric hospitalization of a minor? Andrea B.’s opposition to continued psychiatric hospitalization posed such query.*
Andrea B., respondent in a Person in Need of Supervision (PINS) proceeding at the dispositional stage, was remanded to the Health and Hospitals Corporation for immediate psychiatric observation upon the finding of reasonable cause to believe she was suffering from mental illness requiring such hospitalization in that she manifested behavior dangerous to herself, i.e., suicidal ideation and conduct. Emergency status was afforded the 14-year-old respondent upon her appearance in the court late in the afternoon of March 1, 1978. Her cries of acute distress pervaded the courthouse, and other matters were laid aside. Respondent’s Law Guardian, the Legal Aid Society, had been notified. The court directed an emergency evaluation by a psychiatrist of the Mental Health Services. In testimony before the court, the psychiatrist recommended immediate psychiatric hospitalization as, in his opinion, Andrea B. was then "acutely disturbed” and "a danger to herself.” Cross-examination focused upon the possibility of admission to Metropolitan Hospital as contrasted with Bellevue Hospital. There was no disagreement with the need for emergency psychiatric hospitalization. The court, under the circumstances, remanded pursuant to section 251 of the Family *922 Court Act but adopted the 15-day period prescribed in sections 31.39 and 31.43 (now sections 9.39 and 9.43) of the Mental Hygiene Law, and limited the permissible retention to March 13, 1978. Appended to the order transmitted to the Health and Hospitals Corporation was a request by the Mental Health Services for psychiatric hospitalization. The request set forth pertinent background data and the aforesaid bases for hospitalization and was signed by the examining psychiatrist who had testified in court. On March 13, 1978, the court was informed by the Probation Department that Bellevue Hospital had orally requested a two-week extension of the remand period and that Andrea B. would not be produced in court. The Law Guardian objected. Bellevue Hospital was directed to furnish information regarding Andrea B. in writing, and the matter was scheduled for March 15, 1978. Andrea B. was not produced nor was information provided. On March 15, 1978, the court issued a judicial subpoena to the administrator of Bellevue Hospital In-Patient Psychiatric Service directing production of Andrea B. or explanation for failure to do so on March 16.
On March 16, 15 days after the remand, Andrea B. was produced in court, in the company of the administrator of Bellevue Hospital and the attending psychiatrist in her case. A comprehensive written report, entitled "Psychiatric Summary”, dated March 15, 1978, and hospital records were presented in evidence. The attending psychiatrist attributed the departure from strict compliance with the March 13, 1978 date fixed by the court to severe staff shortage. Consistent with established practice, the doctor explained, on March 10, Bellevue notified the probation officer assigned to the case of the difficulties involved and requested a two-week extension of the remand. The probation folder for the March 13 court date reads: "Recommendation and Basis: Adjournment and continued Remand to H & H Corp. (Bellevue) for two additional weeks at hospital’s request to further evaluate treatment plan for Andrea.”
A clash between the medical and legal disciplines dominated the courtroom presentations by counsel for the hospital and the Law Guardian for Andrea B. The medical profession as personified by the attending psychiatrist and the legal profession in the person of the Law Guardian emerged as opposing protagonists for the standards of their respective disciplines. The Law Guardian urged the individual’s due *923 process rights as the supreme consideration in testing a remand pursuant to section 251 of the Family Court Act. Perplexed and, indeed, offended by the summoning to court, the hospital representatives urged the controlling effect of the medical decision regarding a patient remanded for psychiatric hospitalization pursuant to section 251 of the Family Court Act and the governing applicability of the 30-day limitation for psychiatric hospitalization prescribed by section 251 of the Family Court Act.
Why had the court directed the hospital authorities to produce Andrea B. or in the alternative to offer explanation for the failure to do so?
Section 251 of the Family Court Act provides: "After the filing of a petition under this act over which the family court appears to have jurisdiction, the court may cause any person within its jurisdiction and the parent or other person legally responsible for the care of any child within its jurisdiction to be examined by a physician, psychiatrist or psychologist appointed or designated for the purpose by the court when such an examination will serve the purposes of this act, the court, during or after a hearing, may remand for a period not exceeding thirty days any such person for physical or psychiatric study or observation”.
Section 251 of the Family Court act in its grant of awesome authority reflects the aspirations of the creators of the Family Court as a 20th century experiment: (1) State beneficence in affording medical and social work services would cure societal and familial ills; (2) inclusion of medical and social work services as a component part of the court would ensure proper consideration of those disciplines in resolution of the problems constituting the jurisdiction of the court.
Alas, history has confirmed the caveat voiced by Justice Brandeis in Olmstead v United States (277 US 438, 479-480, dissenting opn): "Experience should teach us to be most on our guard to protect liberty when the government’s purposes are beneficent. Men born to freedom are naturally alert to repel invasion of their liberty by evil-minded rulers. The greatest dangers to liberty lurk in insidious encroachment by men of zeal, well-meaning but without understanding.” Decisional pronouncements soon distinguished the harsh reality and the lofty rhetoric in an age of State beneficence and constructed a legal sanctuary for inviolate individuality in the name of due process safeguards. The celebrated Matter of *924 Gault (387 US 1), need only be named to evoke the veritable revolution wrought to vindicate the constitutional rights of the child qua individual.
Of particular pertinence to the issue at hand are the decisions that address the rights of the individual vis-á-vis State authority exercised either under its police power or parens patriae responsibility to confine involuntarily for psychiatric hospitalization. Cognizant that psychiatric hospitalization subjects the individual to a "massive curtailment of liberty” (Humphrey v Cady, 405 US 504, 509) and drastic imposition upon his dignity, the judiciary views involuntary psychiatric hospitalization, however well intentioned and therapeutically beneficial to the recipient, within the framework of our society’s profound commitment to the individual’s rights of liberty and inviolate individuality. Thus, today "[t]here can be no doubt that involuntary commitment to a mental hospital, like involuntary confinement of an individual for any reason, is a deprivation of liberty which the State cannot accomplish without due process of law.” (Burger, C. J. concurring in O’Connor v Donaldson, 422 US 563, 580.) So perceived, the courts, State and Federal, have proceeded with the task of formulating the substantive and procedural due process rights of the individual faced with involuntary civil confinement or confinement within the context of a criminal charge or conviction.
The Supreme Court set forth the basic substantive due process standards in O’Connor v Donaldson (422 US 563, 575, supra): "A finding of 'mental illness’ alone cannot justify a State’s locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that that term can be given a reasonably precise content and that the 'mentally ill’ can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom.”
 Assuming a constitutionally permissible purpose for confinement, "[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.” (Jackson v Indiana, 406 US 715, 738.) Concomitantly, when the basis for the confinement no longer exists, the confinement must terminate. Not only must the nature and duration of the psychiatric hospitalization reflect the purpose *925 of the confinement, but substantive due process requires adherence to the principle of the least restrictive alternative. The doctrine of least restrictive alternative comprehends not only the degree of physical restraint but the environment, including fellow patients, to which the individual is confined. (Matter of Kesselbrenner v Anonymous, 33 NY2d 161.) "It is an axiom of due process that even though the governmental purpose be legitimate and substantial, that purpose cannot be pursued by means that broadly stifle fundamental personal liberties when the end can be more narrowly achieved. The breadth of legislative abridgement must be viewed in the light of less drastic means for achieving the same basic purpose. Shelton v. Tucker, 364 U.S. 479, 488”. (Covington v Harris, 419 F2d 617, 623, n 17.) "[T]he principle of the least restrictive alternative consistent with the legitimate purposes of a commitment”, Chief Judge Bazelon stated in Covington v Harris (supra, p 623) "inheres in the very nature of civil commitment, which entails an extraordinary deprivation of liberty justifiable only when the respondent is 'mentally ill to the extent that he is likely to injure himself or other persons if allowed to remain at liberty.’ A statute sanctioning such a drastic curtailment of the rights of citizens must be narrowly, even grudgingly, construed in order to avoid deprivations of liberty without due process of law.”
Procedural due process is the primary instrument by which substantive due process rights are vindicated. " 'Procedure’ ” it has been said, " 'is to law what "scientific method” is to science.’ ” (Matter of Gault, 387 US 1, 21, supra.) "The history of American freedom is, in no small measure, the history of procedure.” (Malinski v New York, 324 US 401, 414, opn of Frankfurter, J.)
Due process is flexible, but the procedures must comport with the nature of the interest implicated and the magnitude of the challenge. "[Controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case.” (Mullane v Central Hanover Trust Co., 339 US 306, 313.) When we speak of audi alteram partem, hear the other side, we tap fundamental precepts that are rooted deep in Anglo-American legal history. Indeed, more than two and one-half centuries ago, an English Judge observed, "even God *926 himself did not pass sentence upon Adam before he was called upon to make his defense. Adam (says God) where art thou? Hast thou not eaten of the tree, whereof I commanded thee that thou shouldst not eat?” (Rex v University of Cambridge, 1 Str 557, 567, 93 Eng Rep 698, 704).
 Decisional precedents in defining the due process elements of a hearing at which liberty is at stake, in civil as well as criminal proceedings, have established that the right of confrontation, the right of cross-examination and the right to present a defense are fundamental to fair procedure and hence constitute due process. (See Matter of Gault, 387 US 1, supra; Specht v Patterson, 386 US 605, 610; Bartley v foremens, 402 F Supp 1039, vacated and remitted 431 US 119; Matter of Coates, 9 NY2d 242, 249.) Within the particular context of involuntary psychiatric hospitalization it should be noted that " 'where immediate action is necessary to the protection of society and for the welfare of the allegedly mentally ill person due process does not require notice or hearing as a condition precedent to valid temporary confinement. * * * a mental patient so confined * * * is not unconstitutionally deprived of his liberty so long as he is afforded an opportunity within a reasonably short period 'to litigate fully the question of his mental illness and the propriety of the proceedings which led to his confinement’.” (Fhagen v Miller, 29 NY2d 348, 353-354, cert den 409 US 845.)
"The right to be heard”, the Supreme Court stated in 1932 in Powell v Alabama (287 US 45, 68-69) "would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel.” The holding in Powell v Alabama (supra) was limited, but the perceptive statement of the individual’s need for counsel to safeguard his right to liberty vis-á-vis State action has become the fountainhead for evolving concepts of judicial fairness in our society. Our sensitivity to the realities of the plight of the individual in defense of his liberty against the formidable power of the State has been acutely heightened in the period following Powell v Alabama (supra). Viewed against the present-day dark backdrop of the showpiece "trials”, "gulags” and psychiatric hospitalization of political dissidents in totalitarian regimes, the core concept of Powell v Alabama (supra) stands out in bold relief. The Supreme Court in Gideon v Wainwright (372 US 335), Matter of Gault (387 US 1, supra), and Argersinger v Hamlin (407 US 25) adopted the Powell v Alabama (287 US 45, supra) reason *927 ing and held that the individual faced with "actual deprivation of * * * liberty” in a criminal or like juvenile proceeding has the constitutional right to "receive the benefit of 'the guiding hand of counsel’ so necessary when one’s liberty is in jeopardy.” (Argersinger v Hamlin, supra, p 40.)
Faced with the prospect of psychiatric institutionalization and all that that entails in curtailing liberty by the State, can it be said that in the words of Powell v Alabama (supra, p 69) the individual does not require "the guiding hand of counsel at every stage of the proceedings against him” as an essential component of the right to be heard? No, consistent with Powell v Alabama (supra) and its progeny, the right to counsel, including assigned counsel for the indigent is a due process right. (See Bartley v Kremens, 402 F Supp 1039, supra; People ex rel. Rogers v Stanley, 17 NY2d 256; Schwartz, In The Name of Treatment: Autonomy, Civil Commitment and The Right To Refuse Treatment, 50 Notre Dame Lawyer 808, 819-842; cf. J. L. v Parham, 412 F Supp 112, stay granted pending app 425 US 909.)
New York law, in general, protects the individual against psychiatric confinement by safeguards that go beyond the minimal due process requirements. Section 251 of the Family Court Act presents a glaring exception. To paraphrase Roscoe Pound, " 'the powers of the Star Chamber were a trifle in comparison with those of our juvenile courts’ ” exercising power pursuant to section 251. Quoted in Matter of Gault (387 US 1, 18, supra), section 251, couched in all encompassing language, would seem to confer virtually absolute discretion to confine any individual within a loosely defined broad class of persons for 30 days. Even with the regulations promulgated by the Appellate Divisions of the First and Second Departments and the limited duration of the permissible confinement, section 251 of the Family Court Act appears vulnerable to constitutional challenge and in need of legislative attention. Lofty motives, it must be emphasized, do not immunize against constitutional attack or serve to cure constitutional infirmities. See People ex rel. Thorpe v Clark (62 AD2d 216), in which the Appellate Division, Second Department, referred to similar "legislative oversight” in an analogous problem involving juveniles found incompetent to stand trial.
John Stuart Mill not Hippocrates is the guiding spirit when liberty is at stake. The Bill of Rights governs in our system notwithstanding the benevolence of the State as contrasted *928 with the system envisioned by Plato "whose model for the benevolent despot” according to a commentator who is a psychiatrist, "was the doctor”. (Szasz, The Theology of Therapy in American Law: The Third Century 365, 370.)
The Bill of Rights — Hippocratic Oath distinction emerged as the crucial conflict in the instant matter. Hippocrates the healer could wish for no more dedicated a disciple than the psychiatrist who attended in court in response to the judicial subpoena, but the doctor-patient relationship was opposed by the respondent. That opposition to hospitalization posed the issue for resolution by the court. Since de Tocqueville, observers have noted the primordial role of the court in our system in resolving controversies that appear social, political and even medical in nature. That the court must infuse the expertise of disciplines other than the law into the judicial process does not mean that the ultimate issue for resolution by the court is other than a legal one. Thus, notwithstanding the reliance upon the medical and social work disciplines, the ultimate question in the instant matter is a judicial question: May the State infringe the liberty of the individual Andrea B.?
Andrea B.’s status as a minor does not foreclose her opposition to institutionalization. Although the relationship between the juvenile and the State has not yet been defined in its entirety, there is no longer validity to the assertion that "a child unlike an adult, has a right 'not to liberty but to custody’ ” (Matter of Gault, 387 US 1, 17) as a postulate for institutionalization. "[N]either the Fourteenth Amendment nor the Bill of Rights is for adults alone.” (Matter of Gault, supra, p 13.)
Viewed in accordance with due process commands, the evidence adduced at the March 16 hearing is totally inadequate to warrant further psychiatric hospitalization. The emergent nature and limited duration of the March 1 remand were explicitly defined, and the Bellevue Hospital "Admission Record” refers to section 31.43 (now § 9.43) of the Mental Hygiene Law. Contrasted with the hospital’s so-called "informal request and arrangement” for a two-week extension of psychiatric hospitalization beyond the court limited period, the diagnosis presented on March 16 was "Inadequate Personality” with the recommendation for placement in a "structured residential facility.” Thus, the hospital records and the medical testimony establish that the initial purpose of the *929 March 1 psychiatric hospitalization has ended and that Andrea B.’s needs can be met by services less restrictive than psychiatric hospitalization.
Due process mandates termination of Andrea B.’s psychiatric hospitalization. It would appear unseemly to omit comment on the intensive medical attention and care afforded Andrea B. as reflected in the hospital records and the unstinting dedication of the attending psychiatrist who appeared at the March 16 hearing. Formulated in abstract terms, due process standards may appear aloof from the plight of the individual. Andrea B.’s response to the court’s statement of the limitation of State power confirmed the vital meaning of due process to the individual. Notwithstanding benevolent State intention, Andrea B.’s hospital record portrays a time of medication and strict supervision in a secure environment peopled by the "acutely disturbed” and a 14-year-old "begging to go home.”
Andrea B. is ordered released from psychiatric hospitalization forthwith.

 Decision was rendered orally. In view of the importance of the issues raised and the effect upon untold numbers of individuals, it was deemed advisable to treat the matter in a written opinion and those involved, including the Health and Hospitals Corporation, and the Mental Health Information Service, First Judicial Department, were afforded an opportunity to submit briefs.