OPINION OF THE COURT
Kristin Booth Glen, J.
This order to show cause presents an important question of public policy, of the operation of new article 81 of the Mental Hygiene Law, the adult guardianship statute, and of constitutional necessity. Petitioner seeks the appointment of a guardian and a temporary guardian for an elderly indigent woman who is presently a patient at St. Luke’s Hospital in New York City. Under the statutory scheme of article 81, this order to show cause requires the assignment of a court evaluator (CE) whose purpose is to investigate and advise the court concerning the allegedly impaired person (AIP), and also requires the appointment of counsel. (Mental Hygiene Law §§ 81.09, 81.10.)
At least three of the circumstances which mandate the appointment of counsel under Mental Hygiene Law § 81.10 are present here. They are: petitioner’s request for the appointment of a temporary guardian,[1] petitioner’s request for *934 transfer of the AIP to a nursing home facility,[2] and the request that a guardian be appointed to make major medical decisions without the AIP’s consent.
The statute makes no provision for the payment of counsel other than from the AIP’s estate, or, if the petition is dismissed, from the petitioner. That is, assuming that at least some of the relief requested in the petition is ultimately granted, if the AIP is indigent, there is no available source of payment for counsel. Needless to say, this makes the appointment of counsel, particularly when there are numerous such applications,[3] difficult if not impossible.
This case therefore squarely presents two questions: first, whether counsel is constitutionally mandated in an application such as this, where both liberty and property interests of the AIP are at stake, and, second, whether the court possesses the power to require the payment of counsel by the State or local authority. These issues will be discussed seriatum.
I Counsel is Constitutionally Mandated
Although the constitutional right to counsel originated in the criminal area (see, e.g., Gideon v Wainwright, 372 US 335 [1963]; People v Witenski, 15 NY2d 392 [1965]), it has been extended to a large number of quasi-criminal and civil proceedings. (See, e.g., Rivers v Katz, 67 NY2d 485 [1986] [right to counsel in hearing regarding involuntary administration of psychotropic medication]; Matter of Ella B., 30 NY2d 352 [1972] [right to counsel in neglect proceeding where person faces loss of a child’s custody and control]; Matter of Orneika J, 112 AD2d 78 [1st Dept 1985] [right to counsel in termination of parental rights proceeding]; People ex rel. Silbert v *935 Cohen, 29 NY2d 12 [1971] [right to counsel for juvenile delinquents in revocation of probation proceedings]; People ex rel. Menechino v Warden, 27 NY2d 376 [1971] [right to counsel for adults in revocation of probation proceedings]; People ex rel. Woodall v Bigelow, 20 NY2d 852 [1967]; People ex rel. Rogers v Stanley, 17 NY2d 256 [1966] [right to counsel in involuntary commitment proceeding to civil mental hospital]; Matter of Andrea B., 94 Misc 2d 919 [Fam Ct, NY County 1978] [right to counsel in Family Court proceeding to extend temporary commitment of minor to mental hospital]; Matter of Madeline G. v David R., 95 Misc 2d 273 [Fam Ct, Rensselaer County 1978] [indigent alleged father has right to counsel in paternity proceeding]; Matter of Daley, 123 Misc 2d 139 [Sur Ct, Bronx County 1984] [right to counsel for indigent mother in proceeding where infant’s sister seeks guardianship of infant]; 444 W. 54th St. Tenants Assocs. v Costello, 138 Misc 2d 5 [Civ Ct, NY County 1987] [right to counsel in eviction proceeding for tenant who is absent due to military service].)
Significantly, a number of these cases rest not only on the Federal Constitution, but also on the State Constitution. (See, e.g., People ex rel. Menechino v Warden, supra, at 383; People ex rel. Silbert v Cohen, supra, at 14-15; Rivers v Katz, supra, at 488; Matter of Madeline G. v David R., supra, at 275.)
As a review of these cases suggests, two separate analyses may compel the conclusion that State-paid appointed counsel is constitutionally required in a particular civil proceeding. First, and perhaps most obvious, are all those proceedings in which physical liberty is at stake. The requirement that counsel be appointed for an indigent where she may lose her physical liberty is clearly discussed in the Supreme Court’s opinion in Lassiter v Department of Social Servs. (452 US 18 [1981]). As the Court wrote there: "it is the defendant’s interest in personal freedom, and not simply the special Sixth and Fourteenth Amendment right to counsel in criminal cases, which triggers the right to appointed counsel” (supra, at 25, citing, e.g., In re Gault, 387 US 1 [1967]; Vitek v Jones, 445 US 480 [1980]).
The petition in this case requests, inter alia, that a guardian be appointed to involuntarily transfer the AIP to a nursing home. The AIP resides in her own home, although presently a patient at St. Luke’s for acute care, and the affidavit in support of the petition suggests that her daughter opposes any nursing home transfer, so it is likely that she does as well. There is, therefore, no question that a loss of liberty as *936 significant as those which previously have triggered the appointment of counsel is at stake.[4]
In addition, counsel has been constitutionally required even where a person’s own liberty is not implicated but where "liberty interests” are at issue. The majority of these cases involve recognized constitutional rights concerning parenthood and the family (see, e.g., Matter of Ella B., supra)[5] but have also included rights to bodily integrity. (See, e.g., Rivers v Katz, 67 NY2d 485, supra.)
Lassiter (supra) itself describes the different analysis required in cases where personal freedom is not at stake. The Lassiter Court speaks of balancing the three elements of Mathews v Eldridge (424 US 319 [1976]) "against each other, and then set[ting] their net weight in the scales against the presumption that there is a right to appointed counsel only where the indigent, if he is unsuccessful, may lose his personal freedom.” (Supra, at 27.)

*937
Applying Mathews v Eldridge

In civil cases in which direct personal freedom is not at stake, the court must look to and balance the private interests at stake, the government’s interests, and the risk that the procedures used will lead to erroneous decisions. Under this Mathews v Eldridge analysis, it is clear that, at a bare minimum, counsel must be appointed in article 81 proceedings where at least one of two of the provisions of section 81.10 are met.[6] These are the requests for a transfer to a nursing home or other institutional setting, which presumably would be covered under the liberty or freedom test discussed above, and the ability of the guardian to make decisions on major medical and dental issues against the AIP’s wishes.
A. The Private Interests
The private interests at stake in both instances are great. The decision as to whether one will reside in one’s own home, in a familiar community, or be transferred to an institution against one’s will may be the most serious made in most people’s lives. The ability to make that decision, without State intervention of opposition, is not only about result, but also about the dignity and autonomy of a human being.[7]
Similarly, the ability to make decisions about major medical and dental treatment issues is inherent in the notion of bodily integrity which has been clearly recognized as protected by both State and Federal Constitutions. (E.g., Rivers v Katz, 67 NY2d 485 [1986], supra.)[8] Certainly both of these interests are at least equal to, if not greater than, the private interests *938 involved in a proceeding which may result in a finding of neglect against a parent or parents.
B. The Governmental Interest
Second, the government’s interests in not providing counsel are extremely small. In general, in civil proceedings where the right to constitutionally mandated counsel is argued, the State’s interest is in making the decision provided for in the proceeding as economically as possible, that is to say, avoiding both the expense of appointed counsel and the cost of lengthened proceedings that counsel may cause. (Lassiter v Department of Social Servs., supra, at 28.) In article 81 proceedings, since counsel is legislatively mandated in both nursing home placement and major medical decision-making situations, the latter interest completely disappears from any balancing.
As to the former, the amount of money required, in contrast to the funds already expended on compensation for 18-B counsel, is less than the proverbial "drop in the bucket”. In the First Department where approximately 65,000 appointments are made each year, at a total cost of approximately $26,000,000, 100 or 200 more appointments per year[9] constitutes only a tiny fraction of the moneys already expended.
C. Risk of Erroneous Determination
Finally, the risk of an erroneous determination may have substantial and perhaps even life threatening[10] consequences. In addition, an unwarranted nursing home placement or treatment decision may severely, if not entirely, undermine *939 the autonomy and dignity of the AIP. Such a result would contravene the specific intent of article 81 as manifested in the "Legislative findings and purpose”, Mental Hygiene Law § 81.01, which reads as follows: "[t]he Legislature declares that it is the purpose of this act to promote the public welfare by establishing a guardianship system which is appropriate to satisfy either personal or property management needs of an incapacitated person in a manner tailored to the individual needs of that person, which takes in account the personal wishes, preferences and desires of the person, and which affords the person the greatest amount of independence and self-determination and participation in all the decisions affecting such person’s life” (emphasis added).
Even if the Mathews v Eldridge analysis were less compelling where the powers sought for a guardian include the ability to make major medical and/or dental decisions, appointed counsel is required by the Court of Appeals decision in Rivers v Katz (supra). The Court there held that involuntarily committed mental patients not only have the right to refuse psychotropic medicine, but also the right to have appointed counsel to protect that choice.[11] The major medical decisions contemplated by section 81.22 (8) are almost inevitably as great as, if not greater than, the involuntary administration of psychotropic drugs. Consequently, the right to refuse, as well as the right to counsel in effectuating refusal, is similarly compelled.
For all those reasons, I find that, at least where an article 81 petition seeks powers for a guardian of the person to either place the AIP in a nursing home or other institutional facility, or to make major medical decisions,[12] an indigent AIP *940 is constitutionally entitled to the appointment of counsel at State expense.
II Existing Authority for the Appointment of Counsel
The Legislature has provided for publicly funded counsel in a myriad of situations, most constitutionally required, but some simply as a matter of public policy. The major statutes by which counsel is appointed and compensated by public funds are County Law articles 18-A and 18-B.[13] Those statutes provide for representation at public expense whenever a person faces imprisonment. While the statutes have generally been understood to apply to criminal proceedings in which the defendant may be jailed as punishment for a crime, the 18-B panel in New York also covers persons who face civil or criminal contempts where imprisonment, either as a criminal punishment or as a civil coercive measure, can be imposed.[14]
However, in addition to generally described criminal cases, the statute specifically provides for publicly funded counsel when required by sections 262 of the Family Court Act and SCPA 407. Examination of those sections is instructive. Each of the sections sets forth a number of enumerated procedures in which counsel is required, such as cases involving the potential termination of parental rights, family offense proceedings, child protective proceedings, adoption proceedings, and custody actions or those in which a parent seeks custody or "contest[s] the substantial infringement of his or her right to custody” in any proceeding involving custody over which either the Family Court or the Surrogate’s Court has jurisdiction.[15]
Finally, the statute provides: "In addition to the cases listed *941 [above] a judge may assign counsel to represent any adult in a proceeding under this act if he determines that such assignment of counsel is mandated by the constitution of the state of New York or of the United States, and includes such determination in the order assigning counsel.” (Family Ct Act § 262 [b]; SCPA 407 [b].) In other words, both the Family Court and the Surrogate’s Court, although apparently not the Supreme Court[16] are given the power to assign counsel who will be paid by public funds under article 18-B where the court determines that such counsel is constitutionally mandated.
In addition to article 18-B, there was also provisions in the Judiciary Law and in the Mental Hygiene Law relating to the appointment and compensation of counsel. Mental Hygiene Law § 47.01 establishes MHLS, a legal office with attorneys whose salaries are paid directly by the State, and who provide counsel in a wide variety of proceedings involving the Mental Hygiene Law.[17]
Finally, article 81 itself expands the general jurisdiction of cases in which MHLS can be assigned to include not only cases in which the AIP is a resident of a facility defined in section 1.03 of the Mental Hygiene Law (see, n 15, supra) but also: "a substance abuse program as that term is defined in section 19.03 of [the Mental Hygiene Law], an adult care facility as that term is defined in section two of the social services law, or a residential health care facility or a general hospital as those terms are defined in section two thousand eight hundred one of the public health law.” (Mental Hygiene Law § 81.10 [e].)
Under the statutory scheme presently in effect, MHLS is authorized to represent an AIP who is in a Mental Hygiene Law § 1.03 facility or a hospital such as the petitioner in this *942 case. Thus at first glance it might seem that there is no problem with obtaining counsel here, because counsel is already available under Mental Hygiene Law § 81.10 (e). However, upon further consideration, this apparent solution also becomes illusory, at least in practice.
In enacting article 81, the Legislature responded in part to the inadequacies and ambiguities of old articles 77 and 78 of the Mental Hygiene Law, the conservator and committee statutes. Among other problems, those statutes permitted, and sometimes required, the appointment of a guardian ad litem (GAL), but it was unclear as to what the functions of the GAL were. (See, e.g., Matter of Fisher, 147 Misc 2d 329 [Sup Ct, NY County 1989], supra.) On one hand, the GAL might function as the "eyes and ears of the court”, but, on the other hand, be considered the advocate or counsel for the proposed ward. Clearly this led not only to confusion but also to potential conflicts for the person appointed as GAL.
Accordingly, in enacting article 81 the Legislature split these functions, clearly denominating the CE as the person responsible to the court, and separating the CE’s functions from those of an advocate for the AIP, by requiring the appointment of counsel in mandated situations.[18] (Law Rev Commn Comments, reprinted in McKinney’s Cons Laws of NY, Book 34A, Mental Hygiene Law §81.10, 1993 Pocket Part, at 243.) Indeed, the distinction goes even deeper, since there is absolutely no requirement that the CE, obviously unlike counsel, be an attorney. The statute wisely recognizes that in many situations the person assigned to investigate and report to the court may have conclusions or recommendations at odds with the wishes of the AIP, and acknowledges the AIP’s right to have those wishes and desires vigorously advocated by counsel whose sole loyalty is to the AIP.
Just as the Legislature was silent about the means of compensation for counsel for indigents, it also failed to address the issue of compensation for CE’s where the petition is dismissed, or where the AIP’s estate is inadequate.[19] Thus, in a *943 case like this, where both a CE and counsel are required, if MHLS constitutes the only source from which a CE can be drawn, because of conflict problems it cannot also be a resource from which counsel may be appointed.
In addition, although not the case here, MHLS is not authorized to serve as CE or counsel unless the AIP is already institutionalized. Thus in cases where the AIP is residing in the community, there is no source of payment nor any resource provided for the appointment of either a CE or counsel, where the latter is mandated. Since it appears that both a CE and counsel are required in this case, I employ the means granted by the statute under Mental Hygiene Law § 81.09 (b) (2) to appoint MHLS as the CE. This leaves the question of compensation for counsel which is both mandated by the statute, and, as I have already held, constitutionally required.
Ill The Court’s Power to Order Payment By the State or a Subdivision
Once it has been established that counsel is constitutionally required, it seems an obvious next step to order the State to make payment for such counsel when the person needing representation is indigent. This has, in fact, sometimes been the case. For example, in People ex rel. Rogers v Stanley (17 NY2d 256, 259 [1966], supra), the Court of Appeals wrote: "In our view, the principle of Baxstrom v. Herold (383 U. S. 107); Gideon v. Wainwright (372 U. S. 335); Douglas v. California (372 U. S. 353); Lane v. Brown (372 U. S. 477); Griffin v. Illinois (351 U. S. 12), and similar cases, demonstrates that an indigent mental patient, who is committed to an institution, is entitled, in a habeas corpus proceeding (brought to establish his sanity), to the assignment of counsel as a matter of constitutional right.”
However, later cases, particularly Matter of Smiley (36 NY2d 433 [1975]), suggest that the judiciary should, except in extreme cases, defer to the Legislature’s power over the expenditure of public funds, even where counsel is constitutionally mandated (supra, at 439, 441-442,[20] 443 [dissenting opn *944 of Jones, J.]).[21] Thus, in Taylor v Taylor (NYLJ, May 10, 1991, at 22, col 2 [Sup Ct, NY County]) although I found an indigent incarcerated matrimonial litigant constitutionally entitled to appointed counsel, I eschewed any order for publicly funded compensation for assigned counsel in favor of a pro bono appointment, with the expressed hope—as yet unmet—that the case would provide the impetus for legislative reform in such situations. (Taylor v Taylor, supra.)
However, it is clear that, where constitutionally mandated, courts have also not hesitated to direct payment by appropriate officials of fees or counsel reimbursement when such fees or reimbursement were required in order to satisfy constitutionally protected rights. Thus in Deason v Deason (32 NY2d 93 [1973]) the Court of Appeals held that payment of publication costs in a divorce action, where publication was necessary to obtain jurisdiction over the defendant, was constitutionally required. The Court wrote as follows: Boddie did not * * * decide whether State or local government should bear such costs [of publication] [n]or has the Legislature spoken to the issue. However, whether viewed as an appropriate charge on the welfare budget or an impermissible charge of litigation expenses on the indigent, the burden seems applicable, in the absence of legislation, to the local government. We are, therefore, of the view that this is properly a responsibility of the local governing unit—i.e., the county or, in the City of New York, the city—and, accordingly, we affirm the order of the Appellate Division.” (Supra, at 95.)
Because article 18-B so broadly describes the areas in which public funds may be used to compensate counsel, far beyond criminal proceedings and including Family Court and Surro *945 gates’ Courts proceedings in which counsel is not constitutionally mandated, because both the Family Court Act and Surrogate’s Court Procedure Act permit the appointment of counsel pursuant to article 18-B in any situation in which the court finds that such counsel is constitutionally mandated, and because, like those cases enumerated in Family Court Act § 262 and SCPA 407 this is a situation involving the parens patriae power of the court, and because of the decision in Deason (supra) apportioning fiscal responsibility to the locality, I believe that it is entirely appropriate here, and well within my power, to mandate the payment of appointed counsel by the City of New York under its 18-B plan.[22]
Accordingly, I assign Frank Handelman, Esq. a member of the 18-B panel, who has also completed training on article 81[23] as counsel in this action and direct that appropriate payment under the plan be made to him at the conclusion of this proceeding in accordance with regular 18-B practice.[24]
In making this assignment, I am cognizant of the frequency with which the need for appointment of counsel for indigents in article 81 proceedings occurs. It is to be hoped that the relevant City agencies, the 18-B panel, and, if necessary, the Legislature will take appropriate action to insure that all *946 indigent persons whose liberty is at issue in article 81 proceedings will be given competent, trained and compensated counsel, and that the procedures by which such counsel may be appointed and/or compensated will be made generally known to the Bench and Bar.

. [1] The order to show cause apparently requests the appointment of a temporary guardian on an ex parte basis. Although the statute does not specifically speak to this issue, the Court of Appeals decision in Matter of Fosmire v Nicoleau (144 AD2d 8 [2d Dept 1989], affd 75 NY2d 218 [1990]) makes clear that an ex parte application cannot obviate the due process required opportunity to be heard except in the most extreme circumstances. Nothing in the papers before me suggests that the circumstances here are a matter of life or death. All that is offered in support of the application for a *934 temporary guardian is the statement of a doctor that transfer to a nursing home would be beneficial. Indeed, as the AIP is presently in a full service hospital, there is no question that her health is as well protected as it would be in a nursing home. Therefore there is no emergency situation which would justify dispensing with a right to be heard on this portion of the application.

. The statute actually reads as follows: Counsel shall be appointed where "3. the person alleged to be incapacitated does not consent to the authority requested in the petition to move the person alleged to be incapacitated * * * to a nursing home.”
Consent here clearly means voluntary, intelligent, affirmative consent, not simply silence or apparent acquiescence. The latter constitutes lack of consent, requiring appointment of counsel.

. Since April 1, 1993, the date on which article 81 went into effect, there have been 137 petitions filed in New York County. A substantial number of these proceedings involve AIPs with minimal or no assets.

. In many respects, although involuntary transfer to a nursing home may not seem as serious a deprivation as involuntary transfer to a State mental hospital, the actual deprivation may be far greater. This is because persons involuntarily committed to mental hospitals are subject to periodic review of their commitment, while a person once transferred to a nursing home remains there with no additional court review unless such review is instigated by the patient herself. For obvious reasons, the ability to instigate procedures for judicial review are probably well beyond the capacity of most nursing home residents, and the deprivation of liberty is therefore likely to be permanent. (Cf., Doe v Gallinot, 657 F2d 1017, 1023, n 7 [9th Cir 1981] [requiring mandatory review provision after the involuntary commitment of a "gravely disabled” person].)

. This is a particularly interesting decision because the consequences of a neglect proceeding are far less draconian than those of a proceeding to terminate parental rights. (See, e.g., Santosky v Kramer, 455 US 745 [1982].) Even if neglect is found, there are a number of dispositional alternatives other than removal of the child from his family. Unlike termination, even a finding of neglect with removal does not end the relationship between parent and child. Rather, the law specifically looks to an ultimate reuniting and requires the provision of services so that this will occur. The difference in magnitude of liberty interests involved in neglect and termination proceedings is reflected in the differing standards of proof to which the State is held, i.e., preponderance of the evidence in neglect proceedings (Family Ct Act § 1046 [b] [i]) and clear and convincing evidence in termination proceedings. (Santosky v Kramer, supra.) In Lassiter (supra) the Supreme Court held that counsel was not inevitably required even in termination proceedings. However, our Court of Appeals has held counsel mandated both in termination and neglect proceedings, thus demonstrating a greater commitment to the protection of liberty interests under the State Constitution than is necessarily required under the Federal Constitution.

. This is not to say that a petition which seeks other powers, including powers over property, would not also require appointed counsel as a constitutional matter. (See, Matter of Fisher, 147 Misc 2d 329, 337 [the decision to appoint a conservator (now a guardian of the property) "has legal and practical impact on both property and liberty interests” requiring a full panoply of due process protections under a Mathews v Eldridge analysis].) Because the powers over the person sought here so clearly fall within previous cases requiring counsel, it is not necessary to consider whether publicly paid counsel is required for indigent AIPs in all article 81 proceedings.

. (See, for example, Alexander, Remaining Responsible: On Control of One’s Health Needs in Aging, 20 Santa Clara L Rev 13 [1980].) As Dean Alexander wrote there: " 'The place where one lives is profoundly connected to who one is and how one expresses this sense of self.’ ” (Id., at 21.)

. The right to make one’s own health care decisions has been recognized as a substantial right deserving of governmental protection. (See, e.g., Life-Sustaining Treatment—Making Decisions and Appointing a Health Care Agent, Report of the New York State Task Force on Life and the Law [July 1987]; Cruzan v Director, Missouri Dept. of Health, 497 US 261 [1990].)

. It is estimated that in the First Department approximately 400 cases per year will be filed under article 81. Of these, if history is any guide, less than half will involve completely indigent AIP’s. Many of these cases may not require counsel because no placement, major medical decision-making power, or other substantial interference with liberty is requested.

. With regard to nursing home placement, studies have shown that involuntary nursing home placement carries a substantially increased risk of morbidity and mortality over remaining in the community (see, e.g., Blankner, Bloom, Wasser, Nielsen, Protective Services for Old People: Findings From the Benjamin Rose Institute Study, 52 Social Casework 483 [1971]). The imposition of medical care against an AIP’s wishes may well result in great additional and unnecessary physical and mental anguish with little long-term benefit. This latter is the result of a general tendency to practice "safe” and defensive medicine, a medicine that is frequently not the most humane. For example, imposing unwanted surgery, chemotherapy and/or radiation on an elderly AIP with cancer may briefly prolong that person’s life, but the consequent discomfort, pain and loss of dignity may constitute a far more powerful and countervailing quality of life consideration.

. Following the decision in Rivers v Katz (supra), Mental Hygiene Legal Services (MHLS) has taken responsibility for providing representation in involuntary medication hearings.

. There is at least one other situation where appointed counsel may be constitutionally mandated. Although there is a very strong preference for the AIP’s presence at the hearing (Law Rev Commn Comments, reprinted in McKinney’s Cons Laws of NY, Book 34A, Mental Hygiene Law § 81.11, 1993 Pocket Part, at 245) under certain special circumstances, including the AIP’s absence from the State, that presence may by waived. If this absence is involuntary (as, for example, where the AIP is hospitalized out of State, and the court has no ability to conduct a bedside hearing pursuant to Mental Hygiene Law § 81.11 [c]) "access” to the court has been effectively denied, and counsel for the AIP is required to meet the requirements of due process. (See, e.g., Taylor v Taylor, NYLJ, May 10, 1991, at 22, col 2 [Sup Ct, NY County]; 444 W. 54th St. Tenants Assocs. v Costello, supra.)

. Judiciary Law § 35 also provides for representation in enumerated situations, primarily appeals, none of which are applicable here.

. The inclusion of counsel for indigent persons facing criminal and civil contempts followed the Appellate Division’s decision in People ex rel. Lobenthal v Koehler (129 AD2d 28 [1st Dept 1987]) holding that counsel is constitutionally required in such cases.

. Significantly, all these noncriminal proceedings involve the parens patriae power of the State in the two courts of limited jurisdiction which traditionally wield such power. Article 81’s coverage of adult impaired persons involves similar concerns and similar bases of State power. Indeed, SCPA articles 17 and 17-A specifically provide for guardianship, both of children (SCPA 1701 et seq.) and developmentally disabled persons, including adults (SCPA 1750-a et seq.). Thus a Surrogate hearing a guardianship case may appoint an attorney from the 18-B panel whenever she believes counsel is constitutionally mandated. It makes no sense that a Supreme Court Justice sitting in a similar proceeding could not.

. Where the Supreme Court is exercising power pursuant to the Family Court Act it has the same power as a Family Court Judge (see, Judiciary Law § 35 [7]) and where it is exercising power pursuant to the SCPA it would presumably have the same power as a Surrogate. (Cf., Goldman v Goldman, 132 Misc 2d 870 [Sup Ct, NY County 1986], affd 124 AD2d 1079 [1st Dept 1986].)

. Mental Hygiene Law § 47.01 (a) provides: "[MHLS] shall provide legal assistance to patients or residents of hospitals, schools or alcoholism facilities as defined in section 1.03 of this chapter, or persons alleged to be in need of inpatient care and treatment in such facilities.” Thus, under the general enabling statute, MHLS represents persons in mental hospitals or whose commitment to mental hospitals is being sought. As discussed more fully below, article 81 expands MHLS’s jurisdiction to residents of hospitals other than those specifically related to mental illness.

. Those are: where the AIP requests counsel, where transfer to a nursing home or other institutional placement is sought, where the power to make major medical decisions is sought, or where the petition seeks the appointment of a temporary guardian (see, n 1, supra). In addition, counsel may be appointed where the CE advises the court that it would be useful, or on the court’s own motion. (Mental Hygiene Law § 81.10.)

. In a limited number of cases, those brought by Protective Services for Adults (PSA), a division of the Human Resources Administration (HRA), *943 the City voluntarily assumed the cost of GALs under the old statute at a flat rate of $425, and CE’s under the present statute at a flat rate of $600. However, these funds are only available in cases brought by PSA, and thus have no applicability in a case brought by a private institutional petitioner such as the hospital here.

. The majority wrote: "All of this suggests questions of policy and fiscal impact which the courts should not venture to decide, even if they had *944 the power, which they do not * * * The absence of appropriated funds and legislation to raise taxes under our State constitutional system * * * is not a judicially-fillable gap.”

. The Smiley case (supra) involved a claim of right to counsel in matrimonial cases, based in part on the Supreme Court’s decision in Boddie v Connecticut (401 US 371 [1971]). The majority found that counsel was not required, since the "access” guaranteed by Boddie did not include any guarantee of a favorable result, but only that a divorce litigant’s case would be heard. The dissent recognized "the right of indigent individuals to the assistance of counsel in litigation seeking the dissolution of a marriage” (supra, at 442). However, the dissent agreed with the majority on the question of the Court’s power to order payment, writing: "as to implementation in general of the declared right to counsel, in my view our court should now exercise responsible judicial restraint, inviting the most careful and prompt consideration of the subject by our Legislature.” (Supra, at 445.)

. I note an alternative employed in a decision mandating the appointment of counsel in a case brought under old Mental Hygiene Law article 78 (Matter of Rodriguez [Minna G.], 159 Misc 2d 929) where the court read the requirement of "assignment of counsel at public expense” into the statute in order to constitutionally "rehabilitate” it. Here, rather than reading the right to publicly funded counsel into article 81, it seems more appropriate to include the new category of cases within County Law articles 18-A and 18-B, where I believe the Legislature would have provided for payment had article 81 been in effect at the time of the last amendment of the County Law.

. Article 81 mandates the Office of Court Administration to provide or certify training for CE’s and guardians. Such training has already been offered in New York City by the Association of the Bar of the City of New York, the Brookdale Center on Law and Aging of Hunter College, New York County Lawyer’s Association, and the New York State Bar Association. Although training is not mandated for counsel, I believe a more specialized knowledge of the particular problems of adult impaired persons is helpful in the representation of an AIP, and so have chosen a member of the 18-B panel who has already been certified to serve as a CE and guardian.

. Because a direction regarding payment by the City is involved, a copy of this decision, as well as the order to show cause upon which it is based shall be served upon Margaret Shalley, Director of the Assigned Counsel Plan (the 18-B panel).